Irvin S. **LOZOFF** and Cecile Lozoff,
Plaintiffs,

v.

**UNITED STATES** of America,
Defendant.

No. 64–C–14.

United States District Court
E. D. Wisconsin.

April 27, 1967.

Harvey W. Peters, Milwaukee, Wis., for plaintiffs.

Donald Anderson, Tax Department, Department of Justice, Washington, D.C., James B. Brennan, U.S. Atty., Milwaukee, Wis., for defendant.

## OPINION

TEHAN, Chief Judge.

This is a tax refund suit in which the taxpayers seek to recover federal income taxes for the year 1957 in the amount of $21,516.08 with statutory interest thereon.

The case has been submitted to the court for decision on a stipulation of facts with accompanying exhibits and the arguments of counsel, both in written briefs and oral argument. No testimony of witnesses either by deposition or at trial was adduced by the parties.

## THE FACTS

Plaintiffs, Irvin S. Lozoff and Cecile Lozoff are husband and wife and residents of the Eastern District of Wisconsin.

Plaintiffs timely filed their joint federal income tax return for the year 1957 with the District Director of Internal Revenue and paid the tax shown as due thereon.

On December 22, 1960, the Commissioner of Internal Revenue duly notified taxpayers that it was determined that there was a $21,516.08 deficiency in their joint individual income tax for the year 1957 and an overpayment of $6595.71 of their joint individual income tax for the year 1958. Thereafter, on April 21, 1961,

additional taxes in the amount of $21,-516.08 and interest of $3096.12, a total of $24,612.20 were assessed for the year 1957. A credit for previous overpayment of the 1958 tax of $6595.71 tax was allowed, thus stating a net balance due and owing of $18,016.49 which amount was paid by plaintiffs to Internal Revenue Service, Milwaukee, Wisconsin, on April 26, 1961.

On October 16, 1961, the taxpayers filed with the District Director of Internal Revenue, Milwaukee, Wisconsin, a claim for refund in the amount of $21,516.08, together with interest thereon for the year 1957.

From at least March 27, 1946 through October, 1952, plaintiff, Irvin S. Lozoff (hereinafter called Lozoff) and Curtiss Candy Company (hereinafter called Curtiss) were parties to agreements evidenced by a series of letters and negotiated on behalf of Curtiss by the then president of Curtiss, Otto Schnering. Pursuant to these agreements, Lozoff purchased certain merchandise for Curtiss from such companies as Chase Candy Company, Webster Candies, and Zion Candies for resale by Curtiss to its customers. Under the arrangement, Lozoff received a graduated commission from Curtiss based on the dollar-volume purchases made by him. The letters which evidence the contractual arrangements disclose also that Otto Schnering's son, Robert worked with Lozoff in obtaining the products to be purchased and sold by Curtiss.

In January, 1953, during the time the heretofore described business arrangement was in effect, Otto Schnering, president of Curtiss died, and Robert B. Schnering became president of Curtiss. Thereafter, on August 14, 1953, Lozoff entered into a written agreement similar in nature to the prior arrangement covering the 10-year period from August 14, 1953 to August 14, 1963. The agreement was executed by Robert B. Schnering, son of Otto, as president of Curtiss and by Irvin S. Lozoff, doing business as

Sales Promotion Company. Curtiss agreed in part as follows:

"1. The Second Party hereby appoints and engages the First Party as its sole and exclusive agent for the purchase for and on its behalf of all finished products, materials and commodities of whatsoever nature, make, kind or description, including private label and all other labelled or brand products (all of which are herein for convenience called 'finished products and materials') that the Second Party requires or finds necessary in carrying on and conducting its principal business of a candy manufacturer, and also all finished products and materials which the Second Party requires or uses in supplementing or aiding in any manner whatsoever the sale of its said candy and other merchandise whether the Second Party sells or gives the same away as premiums, prizes or other sale incentives in the marketing of its products; and the Second Party hereby grants to the said First Party the sole and exclusive right to purchase for and on its behalf all of such finished products and materials and the Second Party agrees that it will purchase through the First Party as its exclusive purchasing agent, all of such finished products and materials. The Second Party may, however, upon advance written notice to the First Party purchase such finished products and materials direct from the suppliers thereof upon condition that the Second Party shall pay or shall cause such suppliers to pay the First Party his usual brokerage fee of five (5%) per cent on the amount so purchased at the time herein specified. Such payments to be made on or before the 10th day of each calendar month for all purchases of finished products and materials from any and all suppliers delivered or invoiced to the Second Party during the preceding calendar month.

\* \* \* \* \* \*

"3. The Second Party guarantees that its purchases under this agreement shall be not less than One Million Five Hundred Thousand ($1,500,000.00) Dollars during each year of said ten (10) year term, and in the event its purchases for any one of said years shall be less than said minimum, the Second Party shall pay to the said First Party on or before the 10th day of September next following the close of such year such additional amount of money as shall be necessary to make the total brokerage fees paid to him with respect to such year the sum of Seventy-five Thousand ($75,000.00) Dollars."

The agreement also provided:

"9. This agreement shall inure to the benefit of and be binding upon the parties hereto and their respective heirs and legal representatives, successors and assigns, and the parties hereto agree for themselves and their respective heirs and assigns, to execute any further instrument which may be necessary or desirable to carry out the intent and purposes of this agreement."

On the same day, August 14, 1953, Lozoff and Robert Schnering, as an individual, entered into a partnership agreement under the name of Sales Promotion Company for the purpose of promoting sales of commodities of all kinds, purchasing commodities for sale to others acting as sales consultants, engaging in package engineering and a general food brokerage business. The partnership income tax returns for the years 1953, 1954 and 1955 disclose that the net income after payment of a salary to Lozoff was divided between the partners equally in 1953, and on the basis of two-thirds to Lozoff and one-third to Robert Schnering in the years 1954 and 1955. The only income reported by the partnership were the commissions received from Curtiss pursuant to the August 14, 1953 agreement. In none of those years did these commissions received by the partnership amount to the $75,000 set forth in the agreement between Curtiss and Sales Promotion Company heretofore described as the minimum brokerage fee to be paid to Lozoff, doing business as Sales Promotion Company. In 1953 (partial year)

the commission income was $26,203.32, in 1954, $71,612.75, and in 1955, $28,045.77.

As indicated in a letter of July 25, 1955 from Sales Promotion Company by Irvin S. Lozoff to Robert Schnering as president of Curtiss the commissions due and owing Sales Promotion Company from the inception of the contract were in excess of $100,000. The letter requested a full settlement and accounting by Curtiss no later than August 4, 1955 or the matter would be placed in the hands of an attorney for collection.

At the time this letter was written, Robert B. Schnering, in effect, occupied a dual role. On the one hand, he was president of the company which allegedly owed Sales Promotion Company certain money, and on the other, as an undisclosed partner in the Sales Promotion Company he was a creditor of Curtiss.

Approximately six months later on January 16, 1956, Irvin S. Lozoff entered into an agreement with Robert B. Schnering, in which he purportedly sold, assigned and transferred all of his interest and ownership in the agreement of August 14, 1953 between Curtiss Candy Corporation and Irvin S. Lozoff, doing business as Sales Promotion Company for $200,000 of which $25,000 was payable concurrently with the execution of the agreement and the balance in ten equal installments of $15,000 each, payable on January 16, 1957, and on each January 16th thereafter up to and including January 16, 1966, with a final installment of $25,000 payable on January 16, 1967. This agreement referred to the August 14th, 1953 agreement heretofore described as an "exclusive franchise agreement." It also recited (1) that said "exclusive franchise agreement had been assigned on August 18, 1953 by Lozoff to Irvin S. Lozoff and Robert B. Schnering, doing business as co-partners under the name of Sales Promotion Company;[1] (2) that the partnership known as Sales Promotion Company was dissolved on December 31, 1955; (only about three weeks prior to the execution of the agreement)

and, (3) that also on December 31, 1955, the partnership reassigned the "exclusive franchise" to Lozoff. The agreement also provided that Lozoff, individually, and as a co-partner of Sales Promotion Company release and discharge Curtiss and all suppliers of Curtiss from any and all claims for moneys due as brokerage fees under the contract of August 14, 1953, and that general and special releases be executed to that effect to Curtiss and certain named suppliers.

In order to secure performance with respect to the balance of payments required to be made by Robert B. Schnering under the January 16, 1956 agreement, the parties thereto on the same date executed an escrow agreement with Marshall & Ilsley Bank, Milwaukee, Wisconsin, as pledgee, pursuant to which eleven promissory notes executed by Robert B. Schnering and payable to Irvin S. Lozoff in the sum of $15,000 each and one note in the sum of $25,000 due on the 16th day of January of each successive year commencing with the year 1957 with interest at 5% after default, were deposited, together with 6,320.372 shares of common capital stock of the Curtiss Candy Corporation, subject to sale upon default in the payment of any of said notes.

On March 12, 1957, Robert Schnering made a part payment of $9500.00 on the note due January 16, 1957. Thereafter he failed to pay the balance of the $15,000 note and upon said default, on May 16, 1957, Irvin Lozoff received the certificate for 6,320.372 shares of Curtiss Candy Corporation. On June 13, 1958, Lozoff sold the said shares to Curtiss Corporation for the amount of $40,000 and mutual releases were effected by which Lozoff released any and all claims against Curtiss and Curtiss released any and all claims against Lozoff.

### DISCUSSION

The issue for determination is whether the amount of $9500.00 plus 6,320.372 shares of the common stock of the Curtiss Candy Company, having a fair mar-

---

[1]. The document, if any, evidencing this assignment is not in the record.

ket value of $40,000 received by the taxpayer, Irvin S. Lozoff during the year 1957 constitutes ordinary income or capital gain.

In order for the moneys received in the year 1957 by the taxpayer in the instant case to be treated as a gain from the sale of a capital asset rather than receipt of ordinary income, the taxpayers have the burden of proving (1) that the contract of 1953 meets the requirements of property qualifying as a capital asset under § 1221 of the Internal Revenue Code of 1954; (2) that the transaction of January 16, 1956, constituted a sale of the capital asset under § 1222 of the Internal Revenue Code of 1954.

■ Section 1221 defines a capital asset in broad terms as "property held by the taxpayer (whether or not connected with his trade or business)." It then excludes certain property not relevant to the situation here. However, in determining whether a contract is to be considered a capital asset the courts have looked to the Congressional purpose in affording capital gains treatment. In Commissioner v. Gillette Motor Transport, Inc., 364 U.S. 130, at p. 134, 80 S.Ct. 1497, at p. 1500, 4 L.Ed.2d 1617, the United States Supreme Court stated that the Section

"*  *  * is to be construed narrowly in accordance with the purpose of Congress to afford capital-gains treatment only in situations typically involving the realization of appreciation in value accrued over a substantial period of time, and thus to ameliorate the hardship of taxation of the entire gain in one year.  *  *  * (citing cases)"

It is therefore basic that to qualify as a capital asset, the property must represent an investment capable of appreciating in value over a period of time.

The courts have quite uniformly held that contracts for performance of personal services are not capital assets and the proceeds from their transfer or termination will not be accorded capital gains treatment. See Holt v. Commissioner, 9 Cir., 303 F.2d 687; Gordon v. Commissioner, 5 Cir., 262 F.2d 413; Commissioner v. Ferrer, 2 Cir., 304 F.2d 125; General Artists Corp. v. Commissioner, 2 Cir., 205 F.2d 360.

If, in the instant case, the agreement of August 14, 1953 was simply a contract for performance of personal services in return for compensation, it cannot qualify as a capital asset.

■■ Calling the agreement of August, 1953, a grant of an exclusive franchise, as the taxpayer does, is meaningless since it is the nature of the rights created by the contract and the actual results between the parties that is determinative and not the name given the contract by the parties thereto. In the instant case, the taxpayer has chosen to submit his case on the documents evidencing the transactions without "putting flesh" on their "bare bones" with testimony of the taxpayer as to the actual relations between Irving Lozoff, Robert Schnering, Curtiss Candy Corporation and the suppliers of candy with whom taxpayer dealt. These documents have raised puzzling questions in the court's mind as to those relationships. In the absence of such testimony, the court cannot accept the interpretation of the documents urged by the taxpayer. It is the court's opinion that the taxpayer has failed to prove that the agreement of August 14, 1953, was anything more than a contract in which Lozoff assumed the duties of purchasing agent, i. e., the performance of services of procuring sources of supply for Curtiss in exchange for specified commissions. The taxpayer's contention that the agreement amounted to a franchise (whatever that may mean) because it was "exclusive" and assignable, is not persuasive. We do not believe that taxpayer has proved that the contract was, in fact, assignable by Lozoff. Paragraph 9 of the August 1953 agreement, heretofore set out and on which the taxpayer relies, can be read as but a means of assuring that all outstanding obligations of the parties should be binding on their heirs and assigns in the event of the death of Lozoff or the dissolution of Curtiss. The purported assignment by

Lozoff to Sales Promotion is also not sufficient evidence in view of the relationship of Schnering to Curtiss Corporation as well as the absence in the record of the alleged assignment.

As stated previously, the second condition for the obtaining of "capital gains" treatment is that there be a sale or exchange of the alleged capital assets. A careful scrutiny of the documents and stipulated facts discloses that in fact, no sale or assignment to Robert Schnering occurred. We have previously found that in July of 1955, Curtiss was delinquent in payment of commissions owed Lozoff, although the exact amount is undetermined. There is no indication that the debt was paid before the January 1956 agreement, and it is a reasonable inference that it was not. The provision, however, in the agreement by which Lozoff released Curtiss from any liability for brokerage fees speaks clearly that at least a part of the $200,000 consideration to be paid by Robert Schnering was in settlement of Lozoff's claims for past commissions, and therefore ordinary income, and the remaining portion of the $200,000 was consideration for the cancellation of the ten year contract of August 14, 1953 between Lozoff and Curtiss, and also not entitled to capital gains treatment. See Hort v. Commissioner, 313 U.S. 28, 61 S.Ct. 757, 85 L.Ed. 1168; Gann v. Commissioner, 41 B.T.A. 388; Maryland Coal & Coke Company v. McGinnes, District Director, D.C., 225 F. Supp. 854.

It is the result of the transaction and not the phraseology of the January 16, 1956 agreement that controls.

We deal but briefly with taxpayer's argument that because the Internal Revenue Service acknowledged and accepted plaintiffs' method of reporting the gain from the 1956 transactions on the installment basis, the defendant is thereby estopped from claiming that the income that is the subject of the controversy is not gain from sale of property. The taxpayer has cited no authority for the proposition that the failure of the defendant to challenge the return for one year precludes it from challenging an incorrect reporting of a similar item of income in a succeeding year—nor do we know of any such authority.

For the foregoing reasons, the defendant is entitled to judgment of dismissal of the action and the Clerk is hereby directed to enter judgment in favor of the defendant and against the plaintiffs, dismissing the action.