TOWN AND COUNTRY FOOD CO., INC., PETITIONER v. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 3177–63, 2619–66.   March 31, 1969.

*Lester M. Ponder* and *Maxwell P. Smith*, for the petitioner.
*Eugene M. Corbin*, for the respondent.

ATKINS, *Judge:* The respondent determined deficiencies in income tax against the petitioner in the amounts of $66,367.97, $136,946.97, $159,223.72, $27,857.71, $71,963.41, and $110,129.81, for the taxable years ended April 30, 1956, through April 30, 1961, respectively; additions to tax under section 6653(b) of the Internal Revenue Code of 1954 of $33,183.98, $68,473.48, $79,611.86, and $13,928.86, for the taxable years ended April 30, 1956, through April 30, 1959, respectively; and an addition to tax under section 6653(a) of $3,598.17 for the taxable year ended April 30, 1960.

The parties have by stipulation settled all issues with respect to all such taxable years except those related to the amount of a net operating loss for the taxable year ended April 30, 1962, which would constitute a carryback to the taxable years ended April 30, 1959, 1960, and 1961. The issues remaining are (1) whether in computing the petitioner's net operating loss for the taxable year ended April 30, 1962, it is entitled to use the installment method of reporting income on sales of life memberships in a home frozen food plan; and (2) whether any installment obligations received by petitioner were "distributed, transmitted, sold, or otherwise disposed of" resulting in gain or loss within the contemplation of section 453(d) of the Code.

### FINDINGS OF FACT

Some of the facts have been stipulated and are incorporated herein by this reference.

The petitioner is a corporation organized and existing under the

laws of the State of Indiana, with its principal office and place of business of Fort Wayne, Ind. It was incorporated on February 27, 1947. It keeps its books and records, and files its income tax returns, on the basis of a fiscal year ended April 30 and on an accrual method of accounting, except that for the taxable year ended April 30, 1962, it reported a portion of its sales on the installment method. Its Federal income tax returns for the taxable years in question were filed with the district director of internal revenue, Indianapolis, Ind.

As of April 30, 1961, and April 30, 1962, Robert O. Locke and Carl H. Bruns each owned approximately 45 percent of the petitioner's outstanding stock. The remainder was held in small blocks. During the taxable year ended April 30, 1962, Locke and Bruns were both on the petitioner's board of directors.

During the taxable year ended April 30, 1962, the petitioner regularly sold food and food freezers on the installment plan, as well as for cash. In connection with the sale of a freezer the purchaser received a 1-year service contract and a 5-year warranty on the freezer. Petitioner also sold for cash or on the installment plan, at a cost of $265 each, "life memberships" to persons who did not buy freezers from it, but who already owned freezers purchased from others. Such life memberships gave the purchaser a 3-year service warranty on his own freezer and entitled him, among other things, to purchase food at a price guaranteed to be competitive with any other food distributor for similar quality, size, and service, to have food delivered, to receive profit-sharing dividends, to receive premiums from referrals, to purchase, for an additional fee, credit life, health, and accident insurance, and to have the entire amount paid for the membership applied toward the purchase of a freezer from the petitioner at any time.

Upon the purchase of a freezer or a life membership a purchaser generally made an initial purchase of food. Approximately 60 percent of the freezer and life membership sales were made on credit. A downpayment was made and the balance, which included interest and services charges and the cost of any initial purchase of food, was evidenced by a promissory note payable in regular installments, generally over a period of a year or more. The freezers were sold under conditional sales contracts which contained the promissory notes. The life memberships did not involved conditional sales contracts.

Subsequent sales of food to freezer purchasers and holders of life memberships were made either for cash or on the installment plan.

Prior to the taxable year ended April 30, 1962, the petitioner had followed the practice of selling to several companies the contracts and notes which it had received from customers. In the years immediately

preceding that year such sales had been made primarily to Town & Country Securities Corp. (hereinafter referred to as Securities).[1] Commencing with the taxable year ending April 30, 1962, the petitioner discontinued its practice of selling the freezer contracts and notes and the life membership notes (but continued to sell notes received upon the above-mentioned subsequent sales of food). Instead it decided to retain title to the above notes, and arranged for a $3 million line of credit with Securities, under which it would receive loans from Securities upon the security of such notes and its other assets. On May 16, 1961, the board of directors of Securities held a meeting, the minutes of which contain the following:

Mr. Locke announced that the Town & Country Food Co., Inc. had adopted a policy of retaining title to its paper and giving a chattel mortgage on its paper and certain assets to secure loans made to it by Town & Country Securities Corporation.

* * * it was resolved unanimously that the company lend money to Town & Country Food Co., Inc. of Fort Wayne, Indiana in varying amounts from time to time, not to exceed in the aggregate of $3,000,000.00 at any one time. These loans shall be evidenced by promissory notes dated as of the date of each individual loan with interest rates to be agreed upon from time to time between the Secretary of the Company and the Treasurer of Town & Country Food Co., Inc., not to exceed 12% simple interest per annum. Said notes shall be secured by the chattel mortgage of all assets of said Food Company presented to this board, a copy of which is attached hereto and marked Exhibit "A", provided that said mortgage shall be made to include specifically customer lists of said Food Company, and shall be re-executed by appropriate Food Company officers. Said mortgage shall secure all loans made prior to May 1, 1962.

Pursuant to its $3 million line of credit petitioner borrowed from Securities, on promissory notes, various sums of money. On May 31 it borrowed $200,000 from Securities, giving a negotiable promissory note bearing interest of 12 percent and payable on demand. Such note, which is typical of all notes thereafter issued by petitioner to Securities, contained the following:

This note is secured by a chattel mortgage made by [petitioner] to [Securities], dated May 31, 1961 securing notes executed between May 31, 1961 and May 31, 1962 evidencing indebtedness in amounts not to exceed an aggregate of $3,000,-000.00, and recorded in the office of the recorder of Allen County, Indiana.

The chattel mortgage above referred to provides in part as follows:

TOWN & COUNTRY FOOD CO. [petitioner] * * *, for value received, does hereby mortgage to TOWN AND COUNTRY SECURITIES CORPORATION * * *

---

[1] As of Apr. 30, 1961, Locke and Bruns, and a partnership in which they were equal partners, and trusts of which they were grantors, owned in the aggregate 33,788 of the total of 728,215 outstanding shares of stock of Securities. As of Apr. 30, 1962, they owned approximately the same proportion of stock of Securities. Petitioner had seven directors and Securities had nine directors. The two corporations had four directors in common, which included Locke and Bruns. Locke was the president of each corporation.

All conditional sales contracts, customer lists, promissory notes, secured and unsecured, chattel mortgages, installment sale contracts and any and all other evidences of indebtedness which the Mortgagor now owns and which it may acquire in connection with its business in the future, and all of its furniture, fixtures and equipment located in its office and plant on the California Road, Fort Wayne, Indiana.

This mortgage is given to secure the payment of indebtedness evidenced by a promissory note for the principal sum of two hundred thousand—($200,000.00) Dollars, dated May 31, 1961, and to secure the payment of indebtedness to be evidenced by promissory notes executed within a period of one (1) year from the date of execution of the mortgage, not to exceed an aggregate principal indebtedness of Three Million ($3,000,000.00) Dollars, all executed by Mortgagor to Mortgagee with interest as in said notes provided and with attorneys' fees, * * *

\* \* \* \* \* \* \*

1. WARRANTIES.—Mortgagor warrants that it is and will be the lawful owner and possessor of all of the instruments and personal property covered by the mortgage, that they are and will be free from any and all other liens or encumbrances, and that it will warrant and defend said property against all persons, claims and demands whatsoever. * * *

2. POSSESSION.—Mortgagor may lawfully retain possession of the instruments and property mortgaged hereunder, so long as Mortgagor shall not assign, sell, pledge, or exchange, or in any way encumber or otherwise dispose of the instruments or property, nor remove any of the property from its present location, without the prior written consent of the Mortgagee. Mortgagor at its own expense shall keep such goods and chattels in a good state of repair, and shall pay promptly all taxes or assessments levied thereon. Risk of loss or damage to the property shall be upon Mortgagor, until actual possession of the property be taken by Mortgagee under this mortgage, upon default of Mortgagor as hereinafter provided. Mortgagor agrees to keep the property insured in the manner required by Mortgagee, and in a Company satisfactory to Mortgagee, to the extent required by Mortgagee. The policies of insurance * * * shall provide that loss thereunder shall be payable to Mortgagee as its interest may appear.

\* \* \* \* \* \* \*

5. REMEDIES OF MORTGAGEE UPON DEFAULT.—In the event of default by Mortgagor under the terms of this instrument, Mortgagee shall have the right to take immediate and unconditional possession of the mortgaged property and instruments * * *. Mortgagee shall at its option have the full right, power, and authority to enforce Mortgagor's rights and remedies under the instruments mortgaged against the obligors on the same or it may sell or assign said instruments and the mortgaged property * * * after giving ten (10) days' notice of the time, place and terms of sale to said Mortgagor * * *. Said sale shall be free and clear of any equity of redemption, and all exemptions. * * * From the proceeds of said sale, Mortgagee shall pay first its attorneys' fees, and all costs and expenses incident to the taking possession of the property and the sale thereof, and shall apply the remainder toward the satisfaction of the indebtedness hereby secured. Any surplus shall be promptly remitted to Mortgagor. If the proceeds of sale do not satisfy the debt, interest, and expenses, the Mortgagor shall remain liable for said deficiency, and shall pay forthwith any unpaid balance of the indebtedness secured by this mortgage. * * *

Thereafter during the taxable year ended April 30, 1962, the petitioner continued to borrow amounts from Securities and made repayments on two occasions. Laurel J. Short, petitioner's vice president,

treasurer, and chief finance officer, made the decision as to the amounts to be borrowed and repaid, and the times of such borrowing and repayment, based upon his projections of the cash needs of the petitioner for 30 days in advance. He took into account projected receipts from customers on installment contracts and attempted to keep the interest expense on borrowed funds as low as possible.

The following tabulation shows, as of the end of each month of the taxable year ended April 30, 1962, the balances, as shown on petitioner's books, of petitioner's notes payable to Securities and its notes receivable from sales of freezers and life memberships:

| End of— | Notes payable | Notes receivable from sales of freezers | Notes receivable from sales of life memberships |
|---|---|---|---|
| May | $200,000 | $125,385.35 | $28,002.00 |
| June | 500,000 | 231,685.46 | 56,473.35 |
| July | 500,000 | 401,248.63 | 87,391.40 |
| August | 450,000 | 558,149.30 | 109,948.53 |
| September | 450,000 | 678,202.87 | 127,994.29 |
| October | 600,000 | 811,711.90 | 142,977.91 |
| November | 2,000,000 | 937,737.25 | 156,251.51 |
| December | 2,200,000 | 999,341.39 | 157,320.54 |
| January | 2,550,000 | 1,049,634.77 | 155,411.38 |
| February | 2,650,000 | 1,121,961.85 | 158,883.94 |
| March | 2,750,000 | 1,192,195.78 | 157,442.26 |
| April | 3,000,000 | 1,235,558.31 | 156,693.42 |

During the taxable year ended April 30, 1962, petitioner retained physical possession of, and collected and deposited in its bank account the installment payments on, notes received from sales of freezers and life memberships, its employees making the accounting entries necessary to credit the customers with such payments. If an account became delinquent, petitioner sent a series of three notices to the customer over a 17-day period, and collected any payments made as a result of such notices. If such notices did not result in payment the account was then referred to Securities [2] or some other agency for collection, for which petitioner paid a fee. In the case of collections referred to Securities the fee was paid on a per-diem basis. The accounts were not assigned to Securities or other collection agencies. In all cases the amounts collected, less charges, were remitted to petitioner.

Prior to the beginning of its taxable year ended April 30, 1962, the petitioner kept its books and records and filed its income tax returns entirely on an accrual method of accounting. However, for such taxable year it elected on its return "to use the installment method of reporting installment sales."

As of April 30, 1962, petitioner's books and records indicate that it had deferred income from sales of life memberships and freezers in in the amount of $647,300.76 ($97,977.90 for life memberships and $549,322.86 for freezers) and interest or finance charges on such sales

---

[2] Securities also acted as collection agent for other companies.

in the amount of $184,725.91 ($9,696.15 for life memberships and $175,029.73 for freezers), or a total deferral of $832,026.67.[3]

In its Federal income tax return for the taxable year ended April 30, 1962, petitioner reported a net operating loss of $543,112.16, which resulted in part from the above deferrals of income.

In the notice of deficiency the respondent made several adjustments to petitioner's reported taxable income, resulting in determinations of taxable income of $189,869.22, $333,589.54, and $222,692.40, respectively, for the taxable years ended April 30, 1959, 1960, and 1961. As heretofore pointed out, the parties have now reached agreement as to those adjustments. In its petition relating to the deficiency determined for the taxable year ended April 30, 1961, the petitioner alleges that the respondent erred in not allowing it to deduct $210,976.27, representing the portion of the claimed $543,112.16 net operating loss for the taxable year ended April 30, 1962, remaining after application thereof against the income of the taxable years ended April 30, 1959, and April 30, 1960. In his answer to the petition the respondent denies error in this respect. The parties have stipulated all the controversial items in regard to the computation of the net operating loss for the taxable year ended April 30, 1962, except those relating to the deferral, upon the installment method, of income resulting from installment sales of freezers and life memberships and the interest and finance charges in connection therewith. It is the respondent's primary position that there was a disposition of 57.82 percent [4] of the $1,392,251.73 face value of installment obligations received from sales of freezers and life memberships during the taxable year ended April 30, 1962, as a result of the chattel mortgage arrangement between the petitioner and Securities, and that consequently that percentage of the total deferred income of $832,026.67, or $481,077.82, was improperly deferred by the petitioner. It is his alternative position that, if it be held that there was not such a disposition of any of the installment obligations, then the petitioner is not entitled to report income upon the sales of life memberships on the installment method since such sales do not constitute sales of personal property.

### OPINION

The petitioner contends that in computing its net operating loss for the taxable year ended April 30, 1962, it is entitled to report its income from sales of both freezers and life memberships on the

---

[3] Petitioner did not defer income from subsequent installment sales of food. The notes involved in such food sales were sold during the taxable year. No issue as to this income has been raised.

[4] The respondent arrives at this percentage in the following manner. He takes the position that only $805,000 of the $3 million balance owing to Securities as of the end of the year represented obligations of the petitioner (the balance representing obligations of petitioner's subsidiaries), and that to that extent the petitioner disposed of its installment obligations which constitutes 57.82 percent of the total installment obligations of $1,392,251.73.

installment method prescribed by section 453(a) of the Code.[5] One of respondent's contentions is that the petitioner's sales of life memberships did not constitute sales of personal property entitling it to report income from that source upon the installment method. The petitioner, on the other hand, contends that the sales of the life memberships constituted sales of intangible personal property and are within the statute.

We agree with the respondent that the sales of life memberships did not constitute sales of personal property within the meaning of the statute. A life membership granted the purchaser a number of rights, principally the right to purchase food from the petitioner at competitive prices and have it delivered, the right to the services of the petitioner under a 3-year service warranty on the customer's own freezer, and the right, if he should at any time purchase a freezer from the petitioner, to have the purchase price of the membership applied on the purchase price of the freezer. Thus, a life membership amounted principally to an agreement by the petitioner to render services to the purchaser in the future and to sell property to the purchaser in the future at the purchaser's election. The sale of a life membership did not itself effect the sale by the petitioner of any property whatsoever. And clearly the statute does not relate to the reporting of income arising from an agreement to render services. We hold that the petitioner is not entitled to report income from the sale of life memberships on the installment method.

It should be noted that at the time of purchasing a life membership the purchaser generally also made an initial purchase of food, the cost of which was included in the same deferred-payment note which evidenced the balance due on the cost of the life membership. Food is, of course, personal property, the installment sale of which would come within the scope of the installment method provided in section 453. The record seems to indicate, although this is not entirely clear, that the petitioner in reporting income from sales of life memberships on the installment method included therein the income from initial sales of food. However, if so, the petitioner has not shown the amount thereof and has not shown the factors which would be necessary to permit us to make a segregation and apply the installment method to the income from such initial sales of food. Accordingly, in the recomputation of the petitioner's net operating loss for the taxable year ended April 30, 1962, the full amount of income upon sales of life memberships, including any income from initial sales of

---

[5] Sec. 453(a) of the Code provides:

(a) DEALERS IN PERSONAL PROPERTY.—Under regulations prescribed by the Secretary or his delegate, a person who regularly sells or otherwise disposes of personal property on the installment plan may return as income therefrom in any taxable year that proportion of the installment payments actually received in that year which the gross profit, realized or to be realized when payment is completed, bears to the total contract price.

food which may be contained therein, will be included in taxable income.

The petitioner during its taxable year ended April 30, 1962, regularly sold freezers (together with initial orders of food) on the installment plan, and there can be no question that these sales were sales of personal property for purposes of section 453(a) of the Code. During such year it borrowed funds from Securities under an arrangement for a line of credit whereby all its conditional sales contracts and promissory notes (and certain other assets) automatically, as they came into existence, became subject to the lien of the chattel mortgage which it gave Securities. The respondent takes the position that "by the use of these installment contracts and notes as collateral for loans" the petitioner disposed of its installment obligations, or a portion thereof, within the contemplation of section 453(d) of the Code,[6] and that gain or loss is to be recognized upon such disposition. He argues that section 453 and its predecessor statutes were enacted to relieve taxpayers from having to pay income tax in the year of sale based on the full amount of anticipated profits when they had received in cash only a portion of the sales price, citing *Commissioner* v. *South Texas Co.*, 333 U.S. 496; that when the equivalent of subsection (d) of section 453 of the Code was enacted in the Revenue Act of 1928, it was the intention of Congress to terminate the privilege of longer deferring the profit if the seller at any time realizes such profit by disposing of the installment obligation; and that here the petitioner, by using the installment obligations as security for its line of credit from Securities, is immediately receiving cash based on such obligations while deferring the reporting of the income to a later taxable period, and is thus attempting to circumvent the intent of Congress.

The petitioner, on the other hand, contends that subjecting the installment obligations to the chattel mortgage did not constitute the sale or other disposition of such notes and that section 453(d) of the Code is not applicable.

Section 453(d) predicates its application upon a sale or exchange or other disposition of installment obligations. We think it is obvious that

---

[6] Sec. 453(d) of the Code provides in part as follows:

(d) GAIN OR LOSS ON DISPOSITION OF INSTALLMENT OBLIGATIONS.—

(1) GENERAL RULE.—If an installment obligation is satisfied at other than its face value or distributed, transmitted, sold, or otherwise disposed of, gain or loss shall result to the extent of the difference between the basis of the obligation and—

(A) the amount realized, in the case of satisfaction at other than face value or a sale or exchange, or

(B) the fair market value of the obligation at the time of distribution, transmission, or disposition, in the case of the distribution, transmission, or disposition otherwise than by sale or exchange.

Any gain or loss so resulting shall be considered as resulting from the sale or exchange of the property in respect of which the installment obligation was received.

(2) BASIS OF OBLIGATION.—The basis of an installment obligation shall be the excess of the face value of the obligation over an amount equal to the income which would be returnable were the obligation satisfied in full.

a disposition involves the relinquishment of the substantial incidents of ownership of the obligations. It may well be that in some instances involving claimed borrowing arrangements the taxpayer parts with such a substantial portion of his ownership rights in the obligations as to require the conclusion that he has, in effect, sold or otherwise disposed of the obligations. On the other hand, if it is clear that the taxpayer has merely subjected the obligations to a lien for the payment of indebtedness, he does not lose the privilege of reporting the income from the installment method. As stated in *Elmer* v. *Commissioner* (C.A. 2) 65 F. 2d 568, affirming 22 B.T.A. 224:

> If a merchant discounts his customer's note at a bank, endorsing it, but getting immediate credit for its discount value, it would be a most unnatural thing to consider it a loan from the bank. He remains liable if the customer defaults, but the collection is in the bank's hands, and the transaction is closed in the absence of a default. If on the other hand, a merchant pledges his accounts to a "finance" company and collects them himself, paying the loan out of his collections, it is clearly a loan, and has always been so considered. * * *

Each case must be decided upon the basis of its particular circumstances. Here, petitioner did not part at any time during the taxable year ended ,April 30, 1962, with any substantial incident of ownership in its installment obligations. There was nothing more than the subjection of the installment obligations, along with other assets of the petitioner, to the lien of the chattel mortgage. There is nothing to suggest that the transaction was other than what it purports to be. The amounts which the petitioner obtained as loans from Securities bore no direct relationship to any particular installment obligation or the aggregate of them. It did not realize the cash equivalent of the obligations as they became subject to the lien. Furthermore, the repayment of the petitioner's indebtedness to Securities was not geared to the petitioner's collections upon its installment obligations. The petitioner retained title to, and possession of, the installment obligations. It collected payments as they became due and deposited them in its own bank account. Only in the event of a default by petitioner on its indebtedness to Securities could Securities obtain possession of the installment obligations, and then only for the purpose of satisfying its loan to the petitioner. If the installment obligations were sold upon default any amount received in excess of the amount necessary to satisfy such indebtedness was required to be remitted to the petitioner.

The petitioner did not during the taxable year ended April 30, 1962, sell or otherwise dispose of its installment obligations.[7] Cases cited

---

[7] There was admitted in evidence an exhibit, with attachments, showing some change in the arrangements between petitioner and Securities during years subsequent to the taxable year ended Apr. 30, 1962, which respondent contends bears upon the sec. 453(d) issue for the year ended Apr. 30, 1962. Such subsequent arrangement does not affect the question herein decided, and we express no opinion as to any issue which might arise in subsequent years.

by the respondent, such as *Thomas Goggan & Bro.*, 45 B.T.A. 218, and *East Coast Equipment Co.*, (C.A. 3) 222 F. 2d 676, affirming 21 T.C. 112, involved circumstances entirely different from those of the instant case, and therefore are not applicable.

We accordingly hold that the petitioner in computing its net operating loss for the taxable year ended April 30, 1962, is entitled to take into account the income from the installment sales of freezers (together with initial sales of food) in accordance with the installment method provided in section 453(a), and that section 453(d) is not here applicable.

Upon the recomputation under Rule 50 the correct amount of the net operating loss for the taxable year ended April 30, 1962, will be computed and be carried back and applied as a net operating loss deduction for each of the taxable years ended April 30, 1959, 1960, and 1961, in accordance with the provisions of section 172 of the Code.

*Decisions will re entered under Rule 50.*