REALTY LOAN CORPORATION, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 5202–67.   Filed May 25, 1970.

*Charles P. Duffy*, for the petitioner.
*Gary C. Randall*, for the respondent.

OPINION

Petitioner contends that the primary assets of its mortgage-servicing business which it sold to S & R were its mortgage portfolio, its name, its going-concern value, and its contracts with Mutual Trust and Bankers Life. Petitioner argues that these intangible assets are capital assets in the nature of goodwill. Respondent contends that the only asset of any value which petitioner sold to S & R for the $86,500 was the right to receive the future service fees from mortgages which petitioner was servicing at the time of the sale. Respondent contends that petitioner had no intangible assets in the nature of goodwill or going concern value aside from Holmes' relationship with builders and realtors and with Mutual Trust and Bankers Life. It is respondent's position that the employment contract of S & R with Holmes was the consideration for these assets.

Both parties recognize that if all petitioner sold to S & R was its right to receive future service fees from Bankers Life and Mutual Trust the entire gain realized from the sale is ordinary income and that if a substantial portion of the sales price was paid for the right to receive income, the gain applicable to such portion would be ordinary income and not capital gain. *Nelson Weaver Realty Co.*, 35 T.C. 937 (1961), revd. 307 F. 2d 897 (C.A. 5, 1962), the holding of which was specifically rejected and the dissenting opinion of Judge Rives of the Court of Appeals followed in *Bisbee-Baldwin Corporation* v. *Tomlinson*, 320 F. 2d 929, 930, 934 (C.A. 5, 1963); *Bankers Guarantee Title & Trust Co.* v. *United States*, 418 F. 2d 1084 (C.A. 6, 1969); *General Guaranty Mortgage Co.* v. *Tomlinson*, 335 F. 2d 518 (C.A. 5, 1964); and *United States* v. *Eidson*, 310 F. 2d 111 (C.A. 5, 1962).

In *Bisbee-Baldwin Corporation* v. *Tomlinson, supra*, a case dealing with mortgage-servicing contracts, the court stated at 934–935:

Still, some parts of the "bundle" of contractual rights transferred by Bisbee-Baldwin were capital assets. The mortgage correspondent relationships have value in addition to the rights to servicing commissions. It acts as a "feeder" for related businesses, such as insurance and real estate, frequently engaged in by mortgage bankers. The monthly escrow deposits made by the mortgagors considerably enhance the servicing agent's credit standing. Moreover, as the dissenting opinion in Nelson Weaver recognized, there *is* a sale of "good will". The mortgage portfolio of the mortgage banker tends to increase each year as both the mortgagors and the investors look to the mortgaging servicing agent for further funds and further outlets for investment. * * *

* * * The consideration received for the right to earn future servicing commissions must be regarded as a substitute for such future ordinary income. This important part of the bundle of rights sold or exchanged can be separated from the other parts and should be taxed for what it is * * *

See also *Hugh H. Hodges*, 50 T.C. 428 (1968), in which we allocated a composite price of an insurance business between the amount paid for commissions on renewal premiums on 5-year policies which constituted ordinary income to the seller and the amount paid for the intangible assets which constituted capital gain.

Although S & R was primarily interested in the purchase of the servicing fees to be obtained on mortgages which petitioner was servicing, the evidence shows that it was also desirous of obtaining petitioner's contacts with Mutual Trust and Bankers Life and the goodwill which petitioner had with individual builders and realtors, and the files relating to mortgages procured through such builders and realtors. The bill of sale as well as the other evidence of record supports the conclusion that S & R was primarily interested in the income that would be generated from the mortgage-servicing business and the major portion of the $86,500 was paid for the mortgage-servicing income. The bill of sale provided that if for any reason except S & R's fault, any of the contracts which petitioner was servicing at the date of sale were lost or not transferred to S & R within 2 years of the date of purchase of the mortgage-servicing business, petitioner would pay to S & R 1 percent of the principal balance of such accounts lost or not transferred. Since the remaining balance of the mortgages transferred to S & R at the end of the 2 years would not be less than $7½ million, S & R was granted a protection up to approximately $75,000 on the amount of the $86,500 which is allocable to future income from servicing fees.

S & R purchased petitioner's name but used it only once in connection with a loan in process at the time of purchase. Obviously, therefore the name was of little value to S & R. Included in the assets purchased were petitioner's mortgage files, documents, records, and licenses. These assets had some value to S & R.

On the basis of this record it is difficult to allocate the $86,500 payment between the purchase of future income and the purchase of capital assets. However, since we are of the view that such an allocation is necessary, we will make that allocation on the basis of all the evidence of record.

S & R, for an unspecified number of years after the purchase, received gross servicing fees from the mortgages it took over from petitioner of $40,000. Approximately two-fifths of this amount or $16,000 a year would constitute net income according to the estimate of the officer of S & R who negotiated the purchase. The evidence shows that as the

mortgages are paid off and the balances decline the servicing fees and net income from such fees decline. It would not be expected that a person would pay the full price of the income it expected to receive over the lives of the mortgages. Upon consideration of all the evidence, we conclude that S & R paid petitioner $10,000 for its intangible assets and the portion of the gain from the transaction applicable to this $10,000 is capital gain and the remaining portion of the gain is ordinary income.

Respondent takes the position that petitioner is not entitled to report the portion of the gain from the sale applicable to its sale of its future servicing fees on the installment method.[3]

Petitioner contends that section 453 applies to all sales except for inventory items. Petitioner points out that section 453, dealing with installment sales, does not require that "property" be a capital asset for a taxpayer to be permitted to elect to use the installment method of reporting income. Petitioner argues that its right to future income from servicing the mortgages under its contracts with the owners, primarily Mutual Trust and Bankers Life, was "personal property" as the term is used in section 453.

In *Ann Edwards Trust*, 20 T.C. 615 (1953), affd. 217 F. 2d 952 (C.A. 5, 1955), certiorari denied 349 U.S. 905 (1955), we held that the taxpayer's gain on the sale of fruit on the trees at the time it sold its citrus grove was ordinary income and not capital gain because the fruit was held primarily for sale to customers in the ordinary course of business. We further held that even though the gain was ordinary income petitioner was entitled to report the gain on the installment method, stating at page 618:

> The other issue relates only to the trust petitioners who contend that they may return such ordinary income on the installment basis under section 44 of the Internal Revenue Code. [Footnote omitted. Sec. 453, I.R.C. 1954, is substantially the same provision.]

> On this issue, we think that the petitioners have met the requirements of the statute. If the fruit be regarded as personal property, the facts show that the sales in question were casual sales and not sales in the ordinary course of the petitioners' trade or business, even though the fruit on the trees at the time of the sale was held primarily for sale to customers in the ordinary course of such trade or business. Furthermore, there can be no question, we think, that a growing crop of citrus fruit would not be "property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year." * * *

In *Ann Edwards Trust, supra,* respondent made no contention that the fruit on the trees was not "property." In the instant case respondent

---

[3] Respondent apparently does not contend that the gain applicable to the sale of the capital assets may not be reported on the installment method. We therefore assume that the parties are in agreement in this respect.

apparently does contend that petitioner's contractual right to the income from the servicing fees on the mortgages was not "property" within the meaning of section 453.

Many of the cases holding the gain from the sale of future income to be taxable as ordinary income recognize that the sale is of "property" but hold such "property" not to be a capital asset on the ground that the capital gains provisions should be narrowly construed so as not to apply to a sum which is "essentially a substitute for what would otherwise be received at a future time as ordinary income." *Commissioner* v. *P. G. Lake, Inc.*, 356 U.S. 260, 265 (1958). In that case the Court stated that it would proceed on the basis which had been the premise of the Court of Appeals that the oil payments transferred were "interests in land." See also *United States* v. *Woolsey*, 326 F. 2d 287 (C.A. 5, 1963), in which a right to future income from commissions under an insurance contract is referred to as "property" but the gain from the sale is held to be ordinary income.

In *Commissioner* v. *Gillette Motor Transport, Inc.*, 364 U.S. 130 (1960), the Court held that an amount received by the taxpayer as compensation for the temporary taking of its facilities by the Government during World War II was ordinary income and not capital gain. The taxpayer took the position that the amount was received upon an involuntary conversion of property used in its trade or business and therefore was taxable as capital gain. The Court made the following statement with respect to the contention of the taxpayer at pages 134 and 135:

While a capital asset is defined in § 117(a)(1) as "property held by the taxpayer," it is evident that not everything which can be called property in the ordinary sense and which is outside the statutory exclusions qualifies as a capital asset. This Court has long held that the term "capital asset" is to be construed narrowly in accordance with the purpose of Congress to afford capital-gains treatment only in situations typically involving the realization of appreciation in value accrued over a substantial period of time, and thus, to ameliorate the hardship of taxation of the entire gain in one year. *Burnet* v. *Harmel*, 287 U.S. 103, 106. Thus the Court has held that an unexpired lease, *Hort* v. *Commissioner*, 313 U.S. 28, corn futures, *Corn Products Refining Co.* v. *Commissioner*, 350 U.S. 46, and oil payment rights, *Commissioner* v. *P. G. Lake, Inc.*, 356 U.S. 260, are not capital assets even though they are concededly "property" interests in the ordinary sense. And see Surrey, Definitional Problems in Capital Gains Taxations, 69 Harv. L. Rev. 985, 987–989 and Note 7.

In *Hollywood Baseball Association*, 42 T.C. 234, 265 (1964), affd. 352 F. 2d 350 (C.A. 9, 1965), remanded on another issue 383 U.S. 824 (1966), we held that the intangible contract and property rights which flowed from the exclusive privilege of playing baseball in certain locations as a member of an established league were "property" within the meaning of section 337.

In our view the rights of petitioner to the servicing fees under its contracts with the various insurance companies and particularly its rights under its contracts with Mutual Trust and Bankers Life was "property" in the "ordinary sense" even though these rights were not "capital assets" and the gain received from their sale was not capital gain. The fact that petitioner's rights to servicing fees under its various contracts was a form of property is apparent when these rights are compared to the "life memberships" which we held not to be "personal property" within the meaning of section 453(a) in *Town & Country Food Co.*, 51 T.C. 1049 (1969). In that case we stated at page 1055:

> We agree with the respondent that the sales of life memberships did not constitute sales of personal property within the meaning of the statute. A life membership granted the purchaser a number of rights, principally the right to purchase food from the petitioner at competitive prices and have it delivered, the right to the services of the petitioner under a 3-year service warranty on the customer's own freezer, and the right, if he should at any time purchase a freezer from the petitioner, to have the purchase price of the membership applied on the purchase price of the freezer. Thus, a life membership amounted principally to an agreement by the petitioner to render services to the purchaser in the future and to sell property to the purchaser in the future at the purchaser's election. The sale of a life membership did not itself effect the sale by the petitioner of any property whatsoever. And clearly the statute does not relate to the reporting of income arising from an agreement to render services. * * *

Whereas the taxpayer in *Town & Country Food Co.*, *supra*, was paid by a "purchaser" for agreeing to render services to that "purchaser" in the future, the petitioner in the instant case transferred to S & R for a price its right to receive future income under a contract.

If petitioner's right to receive income from the servicing fees had not been conditional upon the rendition of certain services, which obligation was assumed by S & R, the fact that the right was "property" would be more readily apparent. However, the fact that the income was conditional upon the rendition of services does not cause the contractual right to receive the income for rendering the services not to be a type of "property." The issue we must resolve is whether this right is "personal property" within the meaning of section 453(b).

Respondent does not contend that the transaction here involved was not a "casual sale" and the facts clearly support the conclusion that it was a "casual sale." Each party discusses cases claimed to be comparable to the instant case, stating that no case involving the precise issue has been found.[4] Respondent relies primarily on our holding in

---

[4] In *Hugh H. Hodges*, 50 T.C. 428 (1968), the taxpayer had reported gain from the sale of an insurance business on the installment method and the respondent did not challenge his right to so report the part of the gain which constituted ordinary income. In *United States* v. *Woolsey*, 326 F. 2d 287 (C.A. 5, 1963), the right to use the installment method for reporting gain that was taxable as ordinary income was likewise not challenged by the Government. In *Nelson Weaver Realty Co.*, 35 T.C. 937 (1961), revd. 307

*Charles E. Sorensen*, 22 T.C. 321 (1954). In that case we held that certain options to purchase stock received by the taxpayer as compensation had no ascertainable value when received and therefore when they were subsequently sold the proceeds of the sale constituted ordinary income as a substitute for the compensation which would have been realized of the difference in the price paid for the stock and its fair market value at the date the options would have been exercised, had they not been sold. The taxpayer had contended that the receipts from the sale of the options constituted long-term capital gain. The taxpayer contended that even if the receipts constituted ordinary income, he was entitled to use the installment method of reporting the income since it was from a "casual sale" of "personal property." We stated in this respect at page 342:

> The petitioner contends that even if the proceeds from the sale of the options are held not to be gain from the sale of capital assets held for more than 6 months, he, nevertheless, is entitled to report the income from the sales on the basis provided in section 44 of the Code [sec. 44 of the 1939 Code is the predecessor of sec. 453 of the 1954 Code] for reporting income from sales of property made on the installment plan. Since the sales of the options operated to compensate petitioner for his services, what he received in the form of both cash and notes was income by way of compensation. The provisions of section 44 relate only to the reporting of income arising from the sale of property on the installment basis. Those provisions do not in anywise purport to relate to the reporting of income arising by way of compensation for services. Petitioner is not entitled to have them applied here.

The instant case is factually different from *Charles E. Sorenson*, *supra*. Had the taxpayer in the *Sorensen* case exercised his options, the entire difference in the price he paid for the stock and its fair market value would have been income to him at that time as compensation for services. When he sold the options he received in effect this same difference in the option price of the stock and its fair market value as compensation. The sale could not change the nature of either that for which it substituted or the time at which the amount was includable in income. In the instant case had petitioner not sold its mortgage-servicing business, it would have received income from the mortgages

F. 2d 897 (C.A. 5, 1962), and *Lozoff* v. *United States*, 266 F. Supp. 966 (E.D. Wis. 1967), affirmed per curiam 392 F. 2d 895 (C.A. 7, 1968), the taxpayers apparently did not contend that they were entitled to use the installment method of reporting if the gain was ordinary income and not capital gain. In the latter case the Court held there had been no sale, so in any event this holding would have disposed of the issue had it been raised. In *Leonard Hyatt*, T.C. Memo. 1961–318, affirmed per curiam without discussion of this issue 325 F. 2d 715 (C.A. 5, 1963), a statement is made to the effect that the installment sale provisions are inapplicable to the amount of $52,375 which was a substitute for compensation. However, the facts show that the entire amount of $52,375 was paid to the taxpayer in the year there in issue and loaned back to the payer. The payment was of an amount assigned to the taxpayer by a company of which he was a director as consideration for his assignment to the company of his management contract of a Texas insurance company. The statement in this case with its complicated factual situation is of little help in disposing of the issue in the instant case.

it was servicing at the date of the sale over a period of approximately 8 years and during these 8 years would have serviced the mortgages. The property petitioner sold to S & R was a substitute for its income or profits over a period of years after the sale to S & R. The income petitioner sold was not "compensation for services" as in *Sorensen* but rather the future profit to be realized from the rendition of services, which services after the sale were rendered by another. In *Commissioner* v. *P. G. Lake, Inc.*, *supra*, the Supreme Court held that the payments received for the transfer of oil payments, although not "capital gain," were subject to the depletion allowance as the oil payments would have been had they not been transferred. Similarly, in the instant case even though the amount received is ordinary income, it is a substitute for income which would have been received over a period of years and there is no reason for prohibiting the use of the installment method of reporting that income.

Considering the purpose of section 453(b) which is to permit income from certain sales of personal property to be taxed as it is realized and the facts of the instant case, we conclude that petitioner is entitled to report its entire gain from the sale of its mortgage-servicing business on the installment method even though we have allocated all but $10,000 of the sales price to the sale of future income and hold that the portion of the gain allocable to the sale of future income is ordinary income. In our view the right to future income sold in the instant case was "property" and the sale was a casual one which also complied with the other requirements of section 453(b).

Since we hold that petitioner is entitled to use the installment method it elected in its return, we need not decide whether the entire gain accrued in 1962.

The final issue is whether petitioner is entitled to a deduction or to reduce the gross amount received from S & R by an amount owing to Grimsdell in 1962 as a result of the transfer. The parties stipulated as follows:

The parties agree that the amount actually due and owing to Grimsdell at the time of the transfer of the mortgage servicing business by Realty Loan, to the extent it resulted from that transfer, should reduce the gross amount received by Realty Loan from Sherwood & Roberts.

From the facts stipulated by the parties, we are unable to determine what amount, if any, was actually owing by petitioner to Grimsdell after the sale in 1962 except to the extent that Grimsdell was to retain petitioner's $1,100 share of the loan fee collected by Grimsdell in 1962 as a part payment of the amount owed to him by petitioner as a result of the sale by petitioner of its mortgage-servicing business. Other than the letter of January 2, 1968, there is nothing in the record to indicate what amount of the payment to petitioner by S & R was to be

used as a base for computing the amount owed by petitioner to Grimsdell. The statements in the letter give a fair inference that Grimsdell and petitioner might not have been in agreement on this factor. Also, the fair inference from the 1968 letter is that Grimsdell was to be paid no portion of the $1,971.42 remaining after offsetting the $1,100 unless petitioner were to "break even on the Tabor Hill transactions." The record is barren of information as to the nature of the Tabor Hill transactions. We therefore hold that the record is insufficient to show that petitioner actually owed to Grimsdell in 1962 any amount in excess of the $1,100 due petitioner on a loan collected in 1962 for it by Grimsdell.

Petitioner did not report the $1,100 as income in 1962 and did not accrue any amount as due to Grimsdell. This record does not support making any change in petitioner's method of handling the two items on its 1962 income tax return.

Reviewed by the Court.

*Decision will be entered under Rule 50.*