THE FIRST PENNSYLVANIA BANKING AND TRUST COMPANY, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 1215–68.    Filed June 30, 1971.

*C. Walter Randall, Jr.*, for the petitioner.
*Albert J. O'Connor*, for the respondent.

FORRESTER, *Judge*: Respondent has determined deficiencies in peti-

tioner's corporate income tax in the years and for the amounts as follows:

| Year | Tax |
|------|-----|
| 1959 | $203,405.12 |
| 1960 | 6,448.29 |
| 1961 | 212,573.83 |
| 1962 | 367,400.51 |
| 1963 | 60,357.17 |

Concessions having been made, the only issue remaining for decision pertains to the years 1961, 1962, and 1963 and involves the extent to which petitioner may amortize the purchase price of a mortgage servicing business.

### FINDINGS OF FACT

Some of the facts have been stipulated. The stipulations and exhibits attached thereto are incorporated herein by this reference.

The First Pennsylvania Banking & Trust Co. (hereinafter sometimes referred to as Penn or petitioner) is a corporation organized under the laws of the Commonwealth of Pennsylvania with its principal offices located in Philadelphia, Pa. It filed its corporate income tax returns for the years in issue with the district director of internal revenue, Philadelphia, Pa., using the cash receipts and disbursements method of accounting.

W. A. Clarke Mortgage Co. (hereinafter sometimes referred to as Clarke) was a Pennsylvania corporation with its principal offices located in Philadelphia, Pa. Its business consisted of servicing mortgage loans for various institutional lenders (insurance companies and banks), involving real estate located in 67 counties in Pennsylvania and 7 southern counties in New Jersey. For these services it received fees or commissions under agreements with the lenders.

One of Clarke's principal clients was Metropolitan Life Insurance Co. (hereinafter sometimes referred to as Metropolitan) with which Clarke had entered into an agreement, dated January 24, 1946, under which Clarke agreed to originate mortgage loans, assign them to Metropolitan and thereafter service them for Metropolitan. Clarke paid nothing for the agreement and retained no right in the loans other than the right to service them. In pertinent part, the agreement read:

WHEREAS, the Correspondent desires to sell to the Company loans evidenced by notes or bonds secured by mortgages or deeds of trust on improved city and suburban real estate and to service such loans and certain other loans, contracts of sale, and purchase money loans, hereinafter mentioned, and

WHEREAS, the Company desires to purchase such loans as may be acceptable to it and to have certain Investments, as herein defined, serviced by the Correspondent upon the terms and under the conditions hereinafter set forth;

Now THEREFORE, in consideration of the premises and of the sum of One Dollar ($1.00) lawful money of the United States, to each of the parties hereto

in hand paid by the other, the receipt of which is hereby respectively acknowledged, the parties hereto do hereby mutually agree as follows:

FIRST: The term Investments used herein shall be deemed to refer to loans purchased by the Company from the Correspondent and to other loans, to purchase money loans, and to contracts of sale now serviced by the Correspondent or hereafter placed with it by the Company for servicing.

SECOND: The party of the first part shall act as correspondent in submitting loans to the Company and as agent for the Company in servicing Investments which loans and Investments shall relate to real estate located in the City of Philadelphia and vicinity, Commonwealth of Pennsylvania, and in the City of Camden, and vicinity, State of New Jersey; the provisions of this agreement, however, shall also apply to said Investments, if any, which relate to real estate located outside of said territory.

    \*       \*       \*       \*       \*       \*       \*

FOURTH: When any such loan is purchased by the Company, the Company shall send a remittance in payment therefor to the Correspondent or, if so directed by the Correspondent, shall deposit the amount to its credit in a New York bank.

FIFTH: The Correspondent shall act as servicing agent for the Company with respect to said Investments and in that connection shall

    \*       \*       \*       \*       \*       \*       \*

[The duties of a servicing agent described in the agreement included the collection and disposition of principal and interest payments and escrow deposits, and making certain that taxes and insurance premiums were paid.]

EIGHTH: This agreement may be terminated as to any or all of said Investments at any time by either party hereto by the mailing of a written notice of such termination to the other party.

In the event of such termination the Company may request the Correspondent to continue to service any of said Investments then being serviced by it and the obligation of the Correspondent to perform the services described herein, and its right to deduct and retain a portion of interest collected as aforesaid, with respect to such Investments shall continue only if and so long and in such cases as such performance shall be so requested by the Company.

It is further agreed that, in the event of the termination of this agreement, the Correspondent shall, upon request by the Company, promptly deliver to it or to such person, firm or corporation as may be designated by it all documents, papers and records relating to any or all of said Investments serviced by the Correspondent hereunder with transcripts from the books, papers and records of the Correspondent relating thereto and with all funds which it may hold under the terms of this agreement.

Similar mortgage-servicing contracts dated August 1, 1935, and December 26, 1939, respectively, were in existence for Clarke's business with the Life Insurance Co. of Virginia and Guardian Life Insurance Co. of America. Clarke also had a mortgage service contract with the Seamen's Bank for Savings in the City of New York (hereinafter sometimes referred to as Seamen), dated February 10, 1949, covering four mortgage loans on apartments in New Jersey.

As of July 31, 1960, Clarke was servicing 17,898 [1] separate mortgage

---

[1] All figures herein relative to numbers of mortgage loans and the unpaid principal balances thereof relate to those loans as to which servicing rights were acquired by petitioner.

loans involving an aggregate unpaid principal balance of $177,169,-096.33.[1] These figures did not include 540 loans involving $8,523,463.89 in Clarke's name, committed by others, but still in the process of delivery on July 31. The 17,898 outstanding mortgage loans were being serviced for the following lenders in the following amounts:

| Lender | Separate loans | Principal balance outstanding |
|---|---|---|
| Metropolitan Life Insurance Co. | 16, 695 | $159, 029, 485. 60 |
| Life Insurance Co. of Virginia | 173 | 6, 304, 825. 97 |
| Guardian Life Insurance Co. of America | 146 | 780, 980. 44 |
| The Seamen's Savings Bank | 4 | 7, 533, 853. 43 |
| Miscellaneous | 880 | 3, 519, 950. 89 |
| | 17, 898 | 177, 169, 096. 33 |

When the directors and stockholders of Clarke decided in 1960 to liquidate and dissolve, Penn became interested in acquiring from it the right to service a major portion of the mortgage loans it was servicing. While Penn had no mortgage service department of its own, it anticipated starting up such a department by employing a large portion of Clarke's staff and acquiring Clarke's furniture and fixtures.

Penn entered into negotiations with Clarke. It undertook an analysis to ascertain the number and type of mortgages being serviced, their ages, the remaining principal balance of the loans, the rate of service fees applicable thereto, and the probable remaining service lives of the mortgages.

In addition to the above, petitioner considered that the retention of "late charges" would be a source of income. "Late charges" were penalties assessed against mortgage debtors who did not make prompt monthly payments on their loans and were equal to 2 percent of the late installment. By custom, the mortgage loan servicing agent was permitted to retain all late charges as additional compensation.

Penn also examined the approximate amount of escrow deposits applicable to the mortgages and determined that the average daily balance in escrow in 1960 was aproximately $2,900,000. This escrow fund consisted of mortgagor's payments made each month in advance to furnish sufficient funds for Clarke to pay insurance premiums and real estate taxes on the mortgaged property. Since the property was required to be fully insured and the real estate taxes required to be paid in full, the payments into this fund were not reduced as a mortgage loan was amortized. Clarke deposited the escrow funds in a non-interest-bearing account maintained at a Philadelphia banking institution other than Penn and derived no income whatsoever therefrom. Penn, however, anticipated that it would deposit all collections in its

own banking department, and thus get free and profitable use of the funds.

After lengthy negotiations Clarke entered into an agreement of sale with Penn on September 12, 1960, and at or about the same time entered into a similar agreement with Western Pennsylvania National Bank. The agreement with Penn referred to loans secured by mortgages on real estate located in 7 New Jersey counties and 39 counties in eastern Pennsylvania. The agreement with Western Pennsylvania National Bank referred to loans secured by mortgages on real estate located in 28 other counties in Pennsylvania. Together these counties comprised Clarke's entire servicing territory. Under the agreement of September 12, 1960, Penn obligated itself to pay $2 million to Clarke, of which $400,000 was to be paid at settlement and the balance in four equal annual installments on March 10 of each of the 4 following years.[2] The agreement provided in part:

Subject to the terms and conditions hereafter set forth, at the Closing, Seller will sell to Buyer and Buyer will purchase from Seller for the consideration specified:

(a) Seller's franchise to service the mortgages being serviced by Seller at the time of Closing for each of the following lenders:

Metropolitan Life Insurance Company

Life Insurance Company of Virginia

Guardian Life Insurance Company of America

and for such other lenders for whom Seller now acts as mortgage correspondent as will assent thereto, on real estate which is located in the following territory: [herein were listed the counties covered by the agreement]

\* \* \* \* \* \* \*

(hereafter called "the territory"), together with all of the records and information of Seller pertaining to the servicing of the aforesaid mortgages. The franchises being sold hereunder do not include any franchise to service mortgages which have been settled but not paid by the permanent lender at the time of Closing nor any franchise to service any mortgage which is to be settled after the time of closing;

\* \* \* \* \* \* \*

*4. Action to be taken at the Closing.*

At the Closing:

(a) Seller shall deliver to Buyer a certified or cashier's check or checks for the full amount of all escrow, agency, trustee or other like accounts held by Seller in connection with the mortgages serviced by it within the territory for the lenders covered by paragraph 1 (a) hereof, and Buyer shall deliver to seller its written undertaking to use all funds held by Seller in any escrow, agency, trustee, or other like accounts only for such purposes as said funds were deposited with Seller and to indemnify and hold Seller harmless from any and all claims of any and every nature which may arise with respect to any application, use or manner of handling such funds by Buyer after the Closing;

\* \* \* \* \* \* \*

---

[2] The agreement did not provide for interest on the deferred payments. Respondent seems to recognize that to discount the two-million dollar figure would entitle petitioner to interest deductions. Neither party argues for such discount.

(c) Seller shall deliver written assignments in form acceptable to Buyer and approved and assented to by the appropriate lender assigning to Buyer the franchises being sold under paragraph 1 (a) hereof;

\*     \*     \*     \*     \*     \*     \*

(e) Seller and the purchasers of the capital stock of W. A. Clarke Mortgage Co. of New Jersey shall close under the purchase agreement covering that stock dated the date of this agreement.

\*     \*     \*     \*     \*     \*     \*

*5. Representations and Warranties.*

Seller represents and warrants as follows:

(a) That as of July 15, 1960, Seller was servicing mortgage loans on real estate located within the territory for all lenders, including mortgages settled but not yet paid for by a permanent lender, with an aggregate unpaid principal balance not less than $185,692,000 and that at such date the aggregate unpaid principal balance on such loans being serviced by Seller for lenders other than Metropolitan Life Insurance Company, Life Insurance Company of Virginia and Guardian Life Insurance Company of America was not more than $19,000,000.

\*     \*     \*     \*     \*     \*     \*

(c) That during the period commencing February 1, 1960, and ending April 30, 1960, Seller's gross income received from all lenders for servicing mortgages within the territory was $189,855.09.

\*     \*     \*     \*     \*     \*     \*

(c) All obligations of both Buyer and Seller under this agreement are subject to the fulfillment, prior to the Closing, of the following condition:

(i) Seller shall have received from the Internal Revenue Service a Ruling (issued in response to a request therefor which shall first have been submitted to and approved by Buyer's attorneys, Saul, Ewing, Remick & Saul) in form satisfactory to Seller's attorneys, Duane, Morris & Heckscher, and to Buyer's attorneys, Saul, Ewing, Remick & Saul, to the effect that the transfer of property by Seller to Buyer herein agreed upon will not result in recognition of taxable gain or loss to Seller provided that prior to the sale, Seller adopts a Plan of Complete Liquidation, and that such liquidation of Seller is completed within twelve (12) months after the adoption of the Plan of Complete Liquidation.

The above agreement was amended on February 27 and 28, 1961, to extend the closing date to March 10, 1961 (to be effective as of March 1, 1961), and to waive the requirement of a favorable tax ruling as a condition precedent to performance of the agreement.

On September 12, 1960, the sales agreement date, Clarke also adopted a plan of complete liquidation which was fully carried out within the 12-month period beginning on the date of the adoption of the plan.

Settlement took place on March 10, 1961, at which time Penn paid $400,000 to Clarke. At the same time it received a bill of sale for the furniture, fixtures, equipment, and leasehold improvements and paid an additional $83,793.73 to Clarke therefor.

At the time the agreement of September 12, 1960, was entered into, Penn had received no assurances that any of the lenders would consent to the assignment of the right to service the existing mortgages or that they would give Penn the right to originate, sell, and service future mortgages and permit it to keep the escrow deposits in its own banking department. The assignment of Clarke's right to service existing mort-

gages, however, was a condition for Penn's obligation to complete the purchase at closing.

In its negotiations with the lending institutions concerning the above matters, Penn represented that it expected to acquire Clarke's personnel to do the servicing and that, if it became the servicing agent of the lender's existing mortgage loans, it intended that all collections would be deposited in its own banking department.

Approximately 1 month after the agreement of September 12, 1960, was made, Metropolitan gave Penn oral assurances that it would consent to the assignment of existing mortgages for service, however, it was not until March 1961 that Metropolitan gave any assurance that Penn would be its future correspondent in at least a portion of the same territory covered by the then existing mortgage-loan portfolio. In this latter regard, Metropolitan exhibited some reluctance to designate Penn as its mortgage correspondent because Penn (a lending institution) might be tempted to keep choice mortgage loans for itself and refer only the balance to Metropolitan.

By written agreement dated March 1, 1961, Metropolitan consented to the assignment to Penn of the right to service the then existing Metropolitan mortgage loans. By a separate written agreement dated the same day, Metropolitan designated Penn as its correspondent in submitting loans to it and agent for it in servicing future mortgage loans located in four [3] Pennsylvania counties. This latter agreement specifically provided that Penn's rights were not exclusive and Metropolitan could grant similar rights to others in any of the four counties. Penn has been Metropolitan's correspondent since then for these counties.

Also, on March 1, 1961, both Guardian Life Insurance Co. of America and the Life Insurance Co. of Virginia executed written approval for the transfer of the right to service their then existing loans. The Life Insurance Co. of Virginia also gave Penn the right to service future loans.

There were no written agreements entered into between Penn and Seamen on or after March 1, 1961, but Penn, nevertheless, assumed the servicing of the four Seamen's mortgage loans which Clarke was servicing at settlement.

All the agreements with the lenders provided for cancellation, without penalty or premium, by the lending institutions on written notice. The service fees received by Clarke and subsequently by Penn were calculated on the basis of an agreed percentage of the outstanding balance of the unpaid principal of the various mortgage loans and were usually separately negotiated each time a group of mortgages

---

[3] The record is unclear as to what was done by Metropolitan concerning the other 35 Pennsylvania counties which were formerly serviced by Clarke.

was offered for servicing. The mortgage-servicing agent derived no benefit from prepayment of a loan.

At settlement Clarke was servicing 17,818 separate mortgage loans and Penn undertook the servicing of and continued thereafter to service all of them. Metropolitan was the lender with respect to approximately 90 percent of these loans, involving also approximately 90 percent of the principal balances.

Of the above loans, 17,664 were secured by private dwellings; the average loan had been written on a 25-year-level monthly payment basis and at an annual interest rate of 4.658 percent. This group's average loan was 5¾ years old at the time of settlement and had a remaining service life of 8 years. The remaining unpaid principal balance of the group was $150,863,259 at settlement and the average annual service fee applicable was 0.00491 of the unpaid outstanding principal balance, collectible monthly.

The commercial loans, excluding the four Seamen loans, numbered 150. The average loan in this group was written on an 18-year-level monthly payment basis at an annual interest rate of 5.025 percent. This group of loans was an average 6.956 years old and had a remaining service life of 5 to 5½ years. The average annual service fee applicable was 0.003254 of the unpaid outstanding principal balances, collectible monthly. At settlement the remaining unpaid principal balance of this group was $27,213,234.

The remaining four loans consisted of commercial mortgages serviced for Seamen. Each was written as a 30-year level monthly payment loan with a 4-percent annual interest rate. At time of settlement, they averaged 10 years old and had a remaining service life of 10 years. The annual service fee with respect to them was 0.001875 of the unpaid outstanding principal balance from the end of the 10th year until the end of the 20th and 0.00125 thereafter, collectible monthly. The total remaining unpaid principal balance of this group was $7,-395,504 at settlement.

The average 1961 escrow account balance for all the above-described loans was $2,921,416. When it took over the servicing of the mortgage loan portfolio from Clarke, Penn retained all escrow funds in its own banking department where such funds were subject to its own use.

The lending institutions have maintained accounts at petitioner's bank into which Penn deposited the principal and interest collected by it for the lenders. These deposits were made to a lender's account four times a month and the money was deposited in the bank's general depository account between deposit dates. In 1961, the prevailing interest rate was between 4 and 4.5 percent.

Penn incurred and paid legal expenses in 1961 in the amount of $24,002.88 in connection with the negotiations with and purchase from

Clarke, which it deducted in its 1961 return. Respondent disallowed all of this deduction in his statutory notice of deficiency.

Penn also assigned 71.60314 percent of the $2 million purchase price to the right to service existing home loan mortgages with a 7-year estimated remaining service life and the balance to commercial mortgage loans with a 12-year remaining estimated service life. On this basis it claimed amortization reductions of $209,923.74 (10 months) in 1961 and $251,908.50 in each of the years 1962 and 1963. The entire amount of these deductions was disallowed in respondent's statutory notice of deficiency which stated, in part, "It has been determined that the amount of $2,000,000 expended by you in the taxable year 1961 to acquire a mortgage servicing business is not an amortizable asset."

### OPINION

Petitioner paid $2 million to Clarke under the agreement of September 12, 1960. It contends that it paid this amount solely to obtain Clarke's rights to service three existing loan groups (namely, the commercial, residential, and Seamen loans) and that pursuant to section 167(a)[4] the entire sum is amortizable over the estimated remaining service lives of the three groups. According to petitioner anything else it may have received in the transaction was a windfall, for which it did not negotiate or pay; hence, it argues that the $2 million may be allocated only among the above-mentioned rights.

Respondent, on the other hand, contends that Penn paid the $2 million not only for Clarke's rights to service existing loans but also for Clarke's rights to service the future loans of various lenders, its goodwill, and its value as a going concern. Moreover, respondent contends that the portion of the $2 million allocated among these latter

---

[4] SEC. 167. DEPRECIATION.

(a) GENERAL RULE.—There shall be allowed as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence)—
(1) of property used in the trade or business, or
(2) of property held for the production of income.

(b) USE OF CERTAIN METHODS AND RATES.—For taxable years ending after December 31, 1953, the term "reasonable allowance" as used in subsection (a) shall include (but shall not be limited to) an allowance computed in accordance with regulations prescribed by the Secretary or his delegate, under any of the following methods:
(1) the straight line method,
(2) the declining balance method, using a rate not exceeding twice the rate which would have been used had the annual allowance been computed under the method described in paragraph (1),
(3) the sum of the years-digits method, and
(4) any other consistent method productive of an annual allowance which, when added to all allowances for the period commencing with the taxpayer's use of the property and including the taxable year, does not, during the first two-thirds of the useful life of the property, exceed the total of such allowances which would have been used had such allowances been computed under the method described in paragraph (2).

Nothing in this subsection shall be construed to limit or reduce an allowance otherwise allowable under subsection (a).

elements is not amortizable since they have life spans which are indefinite and uncertain in duration. He concedes, however, that the portion of the price allocated among the rights to service the existing loan groups is amortizable but apparently differs with petitioner as to the periods over which the three groups may be amortized.[5]

The issues herein presented are analogous to those arising on the other side of the coin, namely, whether the vendor in a similar transaction sold a capital asset in the nature of goodwill or sold the rights to future income in the form of his servicing contracts. Upon analysis of the transactions, courts in numerous cases have held that the vendor sold a combination of both. *Realty Loan Corp.*, 54 T.C. 1083 (1970), on appeal (C.A. 9, Nov. 27, 1970); *General Guaranty Mortgage Co. v. Tomlinson*, 335 F. 2d 518 (C.A. 5, 1964); *Bisbee-Baldwin Corporation v. Tomlinson*, 320 F. 2d 929 (C.A. 5, 1963); *Bankers Guarantee Title & Trust Co. v. United States*, 290 F. Supp. 522 (N.D. Ohio 1968), affd. 418 F. 2d 1084 (C.A. 6, 1969). Recently, in *Western Mortgage Corporation v. United States*, 308 F. Supp. 333, 337 (C.D. Cal. 1969), and *Securities-Intermountain, Inc. v. United States*, an unreported case (D. Ore. 1970, 25 A.F.T.R. 2d 70–795, 70–1 U.S.T.C. par. 9268), the tax treatment to be accorded the vendee in such transactions was under consideration. Both courts held that the vendee purchased an amortizable intangible capital asset, namely the right to service existing loans, and nonamortizable capital assets in the nature of goodwill.

In *Bisbee-Baldwin Corporation v. Tomlinson, supra*,[6] the taxpayer, Bisbee-Baldwin Corp. (hereinafter sometimes referred to as Bisbee) was in the mortgage banking business. After making loans which were normally secured by mortgages, it invariably would assign the mortgages to various institutional investors, who, in turn, under agreements with Bisbee, employed it to service the mortgages at an annual percentage commission rate of the principal outstanding balances of the mortgages serviced. Bisbee's servicing activities generated other business. For example, it often acted as a real estate broker when the mortgaged property was sold, served as a property manager

---

[5] Respondent, on brief, entitled his main argument: "Some part of the purchase price was paid to acquire an intangible asset having a life which was indefinite and uncertain in duration." This sentence refers to the portion of the purchase price allocable to going-concern value, goodwill, and items of this nature. By implication, therefore, respondent concedes that the other intangibles, namely the rights to service existing loans, have life spans which are definite and certain, the necessary criteria to amortize an intangible asset. Sec. 1.167(a)–3, Income Tax Regs. In valuing the three loan groups, respondent proposed a life span for each group which was the difference between the average number of years for which a loan group was written and the loan group's average age at the time of purchase. Apparently, the periods he would have us utilize for amortization of the groups are those he utilized in valuing them.

[6] In this case the Fifth Circuit reversed its prior decision in *Nelson Weaver Realty Co. v. Commissioner*, 307 F.2d 897 (C.A 5, 1962), reversing 35 T.C. 937 (1961). For a brief discussion of the *Weaver* case see fn. 12 *infra*.

when a mortgage was foreclosed, and wrote fire insurance on the property. Also, Bisbee's credit rating was enhanced by the mortgagor's escrow deposits.

The agreements with the lending institutions were nonassignable and Bisbee could not demand any payment from a successor servicing agent if an investor transferred his business. Moreover, under the various agreements, each investor had the right to enter into similar agreements with other servicing agents in the area, and Bisbee had the right to assign and service mortgages for other investors.

During the year in issue, various investors canceled their servicing agreements and several paid termination fees which were provided for in the agreements. The investors were reimbursed by their new servicing agents for the termination fees. In substance, Bisbee transferred its mortgage servicing rights to the other agents, since no cancellation would have occurred had the new agents not agreed to reimburse the investors. It reported the fees as long-term capital gain.

The Fifth Circuit held that the basic rights sold were the annual servicing commissions on the principal balance outstanding on the mortgages; that this was a substitute for the income which would have been earned by Bisbee had it not transferred the contracts and that the purchase price allocable thereto was taxable as such. It also held, however, that (320 F.2d 934–935):

Still, some parts of the "bundle" of contractual rights transferred by Bisbee-Baldwin were capital assets. The mortgage correspondent relationships have value in addition to the rights to servicing commissions. It acts as a "feeder" for related businesses, such as insurance and real estate, frequently engaged in by mortgage bankers. The monthly escrow deposits made by the mortgagors considerably enhance the servicing agent's credit standing. Moreover, as the dissenting opinion in Nelson Weaver recognized, there is a sale of "good will". The mortgage portfolio of the mortgage banker tends to increase each year as both the mortgagors and the investors look to the mortgaging servicing agent for further funds and further outlets for investment. The taxpayer's extensive files and equipment are in the nature of capital assets. (Most of these were retained by the taxpayer.) These items are closely related to the everyday business operations of the taxpayer. * * *

Further, it stated that while these above items were closely related to the everyday business operations of the taxpayer, they were not so integrally related as to make them insusceptible of separate valuation. Accordingly, the right to earn future servicing fees was separately valued from the other items sold and the value received therefore taxed as ordinary income.

In Realty Loan Corp., supra, which involved the sale of a mortgage-servicing business similar to that in the instant case, we followed Bisbee-Baldwin and separately valued the vendor's right to receive

servicing fees in the future, treating the price received therefore as ordinary income to him. The remainder of the selling price was allocated to a bundle of rights constituting capital items similar to those in *Bisbee-Baldwin* and was taxed at capital gains rates.

We find no pertinent distinction between the vendor and the vendee insofar as the susceptibility of valuing the right to service existing loans separately from the other bundle of rights purchased by him. Of course, the tax treatment to be accorded the sums allocated is different for the vendee.

With regard to the instant case, respondent, as noted earlier, contends that petitioner purchased the right to service existing loans and also purchased other intangible assets which were essentially the same as the intangibles given capital gain treatment in *Bisbee-Baldwin*. He concedes that petitioner's rights to receive servicing fees on the three loan groups are amortizable but apparently disagrees as to the period over which they may be amortized. The other items, according to him, are nonamortizable. Thus, if respondent's contention is correct, that items other than servicing rights to existing loan groups were purchased, we must make separate valuations to determine the portion of the $2 million which may be amortized. *Western Mortgage Corporation* v. *United States, supra; Securities-Intermountain, Inc.* v. *United States, supra.*

Upon analysis of the transaction, we find petitioner's argument untenable that everything it received (other than the rights to service existing loans) was a windfall for which it did not pay or negotiate. Quite to the contrary, we think petitioner knew exactly what it would be getting in addition to the right to service existing loans and that part of the $2 million is allocable to other intangible capital assets, as has been argued by respondent.

Before the transaction, Clarke originated loans for various lenders and also serviced loans which in many cases it had originated. Afterwards, petitioner was virtually in the same shoes—it hired most of Clarke's employees, serviced loans formerly serviced by Clarke, serviced the future loans of Metropolitan and the Life Insurance Co. of Virginia, had full use of the escrow funds associated with all loans, and was in possession of Clarke's records and information on servicing loans. Clearly, petitioner wound up with much more than the rights to service existing loans, albeit these rights were the most important ones purchased. In net effect it had acquired a part of Clarke's business operations because of the void left by Clarke's termination of business activity.

At the time of the agreement of September 12, 1960, and during the negotiations with Clarke, Penn realized that Metropolitan (Clarke's primary client) and other lenders would be without a correspondent

for future loans once Clarke liquidated. In fact, petitioner admitted at trial that it had intentions of trying to secure the right to service future mortgages of Clarke's lenders before the September 12 agreement was made, and indeed it negotiated for these rights after the agreement. Its goal from the beginning was to establish a mortgage loan service department which would be generating business of its own, not merely servicing a wasting asset such as the existing loans serviced by Clarke. The future business of Clarke's lenders, especially Metropolitan, would form a prime foundation for such a business and the right to service future loans could have been assigned just as easily as the rights to service existing loans were assigned, since consent by the lender was necessary in either event.

The economic realities of the actual transaction were such that the petitioner acquired, along with its rights to service existing loans, an opportunity to succeed Clarke as a mortgage correspondent for future mortgages. Cf. *Western Mortgage Corporation* v. *United States*, 308 F.Supp. 333, 337 (C.D. Cal. 1969). This was a preferred position and represented a "business advantage," cf. *Bankers Guarantee Title & Trust Co.* v. *United States*, 418 F.2d 1084 (C.A. 6, 1969). The fact that no mention was made in the contract concerning the servicing of "future loans" does not preclude a finding that a part of the consideration was paid for this opportunity, and we so hold. The form in which the transaction is cast cannot overshadow its substance. Cf. *F. W. Drybrough*, 45 T.C. 424, aff'd. 384 F.2d 715 (C.A. 6, 1967).

Of course, the opportunity to use *escrows associated with the right to service future loans* was obtained as well. We note also that petitioner obtained the opportunity to utilize *escrow funds associated with existing loans* serviced by Clarke. Again, these two opportunities were not specifically transferred by the agreement but clearly petitioner was seeking to utilize the escrows. In fact, after the agreement of September 12, petitioner, in its negotiations to service existing loans of the lenders, required that the escrows associated therewith also be transferred. The escrow funds consisted of payments made monthly in advance to furnish sufficient funds for the servicing agent to pay insurance premiums and real estate taxes on the property. These escrows could be deposited in its banking department where petitioner would be able to utilize the funds interest free in its own lending operations and hence derive profit therefrom.

As we view the transaction, petitioner received more, however, than just the opportunity to obtain the right to service future loans and the utilization of the various escrow accounts. It also obtained a closely interrelated item—the value of Clarke as a going concern. From the outset, petitioner knew that Clarke would dissolve and that in all probability it would take over Clarke's personnel, along with its files

and equipment, thus benefiting from Clarke's experience and know-how. The personnel were expected to, and did, continue to perform the same duties and services as they had for Clarke, including making contracts with builders and brokers for the purpose of generating new business. Anthony Felix, petitioner's witness, admitted that there would be considerable savings in startup expense of a business such as this if an existing organization were taken over. The intangible asset thus obtained had value from petitioner's standpoint not only because it was able to service existing mortgages but also because it could obtain and service future mortgages. Moreover, petitioner must have anticipated using Clarke's personnel for more than the servicing of existing mortgages—otherwise, it would have had a dwindling asset, with a crushing overhead as the asset neared exhaustion.

We note that the agreement did not (and obviously could not) state that Clarke's employees were bound over to Penn, but this does not detract from the *probability* that the employees would join petitioner's operation and that this factor formed a part of the going-concern value which was purchased. Also, while petitioner did not use Clarke's name, it did have access to the files and opportunity to continue established relationships. Thus petitioner acquired an asset in the nature of goodwill, which formed a part of the going-concern value.

Though the September 12, 1960, agreement did not specifically mention that Clarke was being purchased as a going concern, it did state that Clarke's equipment and files, pertaining to the servicing of loans, were to be received by petitioner. This, along with the fact that Clarke was planning to liquidate, indicates that a going concern was being purchased. It follows that a portion of the $2 million is allocable thereto. As noted previously, respondent contends that the portion allocable to the going-concern value and the servicing rights of possible future loans and their associated escrows is not amortizable. We agree, and so hold. Section 1.167(a)–3, Income Tax Regs., provides, with regard to the amortization of intangibles:

Sec. 1.167(a)–3. Intangibles.

If an intangible asset is known from experience or other factors to be of use in the business or in the production of income for only a limited period, the length of which can be estimated with reasonable accuracy, such an intangible asset may be the subject of a depreciation allowance. Examples are patents and copyrights. An intangible asset, the useful life of which is not limited, is not subject to the allowance for depreciation. No allowance will be permitted merely because, in the unsupported opinion of the taxpayer, the intangible asset has a limited useful life. No deduction for depreciation is allowable with respect to goodwill. * * *

The above-mentioned items are but expectations, indefinite in every regard and of unknown life expectancy. This is no more clearly evi-

denced than by the fact that at the time of the instant proceeding, petitioner still remained the servicing agent for future loans of Metropolitan and the Life Insurance Co. of Virginia. The going-concern value obtained with its element of goodwill still benefited petitioner, as did the opportunity (opened by Clarke's liquidation) to become a future correspondent for these two lenders.

The rights to service existing loans, on the other hand, are amortizable, as has been conceded by respondent. We have found, as a fact, that the average life spans of the three existing loan groups are 8 years for the residential, 5½ years for the commercial, and 10 years for the Seamen.[7] These average life spans provide the requisite bases, as required by the above regulation, for amortizing the loan groups.[8] The life spans of the three existing loan groups would also be the life spans of the escrow accounts associated therewith. These escrows therefore have a definite and limited life span and, accordingly, under the regulation the value of the right to utilize them is also amortizable.

The question remaining at this point is purely one of valuing the amortizable items, i.e., the right to service existing loans and their associated escrows. Both respondent and petitioner presented experts who valued the right to service existing loans.

Petitioner's first expert witness, Allen C. Thomas, Jr. (hereinafter sometimes referred to as Thomas), testified that in his opinion the remaining service life of the residential loan group was a little less than 8 years; the commercial loan group had a remaining life of 5 to 5½ years, and the four Seamen loans had a remaining service life of 10 to 15 years. Thomas has been employed by the Penn Mutual Life Insurance Co. (hereinafter sometimes referred to as Penn Mutual) since 1942. He became assistant manager of its mortgage loan department in 1947, second vice president of that department in 1956, vice

---

[7] These figures are based mainly upon the testimony of petitioner's expert, Allen C. Thomas, which testimony we shall discuss later with regard to the valuation.

[8] Respondent did not contend that the right to service existing loans was nonamortizable, because it was an "indivisible asset." The indivisible asset theory is applied to preclude amortization for customer lists and contacts similar to customer lists. See *Anchor Cleaning Service, Inc.,* 22 T.C. 1029 (1954) ; *Golden State Towel & Linen Service, Ltd.* v. *United States,* 373 F.2d 938 (Ct. Cl. 1967) ; *Aaron Michaels,* 12 T.C. 17 (1949) ; *Manhattan Co. of Virginia, Inc.,* 50 T.C. 78 (1968). The theory is that such lists equal one asset and loss of an account is offset in a continuing manner by additions thereto. *Anchor Cleaning Service, Inc., supra.* As stated in *Commissioner* v. *Seaboard Finance Co.,* 367 F.2d 646, 652 (C.A. 9, 1966), affirming a Memorandum Opinion of this Court:

"The rationale and purpose of the 'indivisible asset' rule is to prevent taxpayers from increasing the value of depreciable property to offset the amount paid in excess of book value of assets purchased. This doctrine makes it possible to strike down depreciation deductions for amounts which should properly be allocated to goodwill."

Where, as here, we can value the right to obtain commissions for the three existing loan groups, ascertaining a useful life for each, and at the same time separate therefrom the value of items in the nature of goodwill (going-concern value) and the rights to service future loans, the indivisible asset theory is inapplicable. For a more comprehensive analysis of the inapplicability of the "indivisible asset rule" in an analogous case, see *Western Mortgage Corporation* v. *United States,* 308 F.Supp. 333, 339–341 (1969).

president in 1960, and financial vice president in 1965. Penn Mutual engaged in a considerable amount of mortgage loan business. As of 1960, it had on its books approximately 31,000 mortgage loans in the total amount of $472 million on real estate located throughout the United States with a concentration in California, Pennsylvania, New York, and Texas.

Thomas' opinion was based on his experience dealing with such a considerable number of loans at Penn Mutual and also was based on the industry as a whole. In such an industry it is imperative that a judgment be made as to how long a loan will be outstanding before it is paid off in order to determine the yield which will be obtained from a prospective loan group. Thomas was involved in this decision-making process for a considerable length of time and we find his qualifications to be exceptionally good. We have in large part adopted his opinions as our findings of fact as to the average service life spans, after consideration of the record as a whole.[9]

In valuing the right to service existing loans, petitioner's second expert witness, Joseph Hudson (hereinafter sometimes referred to as Hudson), utilized average life spans for the three groups of 8 years for the residential, 5½ years for the commercial, and 10 years for the Seamen. His method of valuation is best described by an example utilizing the commercial loan group. The average mortgage in that group was written for 18 years at an interest rate of 5.025 percent and was 6.956 years old at time of settlement. The average service fee was 0.3254 percent of the unpaid remaining principal balance, collectible monthly. Hudson utilized a direct reduction loan amortization schedule under the 18-year, 5-percent table and determined the principal balance for a $1,000 loan that was 6 years 11 months old. He then determined the monthly principal balances for the next 5½ years, the average life span of the commercial group loan. Each monthly principal balance was multiplied by the commercial service fee of 0.3254 percent, and divided by 12 to determine the monthly service fees.

---

[9] Respondent, on brief, criticized Thomas' testimony, but we think with little basis therefor. For example, he contended that Thomas' statement that a residential loan with a 25-year term had a 10-year average life was inconsistent with his opinion that the group of residential loans herein involved (which were an average 5¾ years old) had a little less than an 8-year remaining service life. According to respondent, the latter opinion creates an average life span of 13¾ years for a 25-year term loan, contrary to Thomas' other statement that a 25-year loan at its inception had a 10-year life span. This, however, is not necessarily true. A 25-year term loan group which is several years old may well have a longer remaining life span than the group had at its inception. An aged loan group certainly may have different characteristics than those at its inception. In the analogous area of life expectancies for humans, sec. 1.72–9, Income Tax Regs., states in Table I that a 6-year old male has a remaining life expectancy of 65 years but a 36-year-old male has a life expectancy of 37.3 years. The total expected life span for the 6-year old is 71 years but for the 36-year old it is 73.3 years. We do not consider the figures contradictory because the additional fact of age has changed the statistical probabilities.

The total principal amount of the loans in the commercial group at their inception was $38,019,523; therefore, all figures were multiplied by 38,019.523 since a $1,000 table was being used. The total service fee for the commercial loan group was the sum of the resulting figures.

The above method of computation was the same for the Seamen loans and the residential loans but Hudson (a) used the 30-year 4-percent table with respect to the Seamen's loans; (b) with respect to the residential loans, he averaged between the 25-year 4½ percent table and the 25-year 4¾ percent table since the stipulated average interest rate of this group of mortgages was 4.658 percent; and (c) computed the fees on the residential group for an 8-year period and the fees on the Seamen loans for a 10-year period.

The total gross service fees produced by the above methods and the net profits were as follows:

|  | Gross | Net |
|---|---|---|
| Residential | $5, 065, 514 | $2, 945, 837 |
| Commercial | 387, 848 | 375, 485 |
| Seamen | 112, 763 | 112, 163 |

Net profits were determined by Hudson on his estimate that it would cost $15 a year to service each loan. This $15 figure was the approximate average annual cost for Clarke to service its loans and, in fact, over a 6-year period after purchase, the average annual cost per mortgage loan serviced by petitioner approximated this amount.

Hudson also made an evaluation of the amount of net earnings which the escrow funds for the various loans would produce in the hands of the bank, based on a 4-percent net return and an average $2,900,000 in such funds always being on deposit. This resulted in potential earnings of $710,488 on the residential escrows, $128,546 on the commercial escrows, and $46,740 on the Seamen escrows.

We have difficulty accepting Hudson's valuations for many reasons. First, we are skeptical of a total valuation for the servicing rights alone which is well above $2 million since that would indicate a tremendous bargain purchase by petitioner. It is hard for us to believe that in an arm's-length transaction Clarke would have been willing to sell its rights for anything less than their worth. The contract was conditioned on the consent to assignment of the right to service existing loans by the lenders. If these rights were worth well over $2 million, petitioner was making a bargain purchase, indeed, since the intangibles obviously had significant value.

In addition, Hudson did not make any allowances (discounts) based upon the future nature of the prospective earnings nor did he consider factors relating to servicing loans which might cause the discount factor on future earnings from the existing loans to be higher than the prevailing interest rates. These facts, of course, make the figures much too high.

With regard to the value associated with utilizing the escrow funds of existing loans, we also have great reservations. Here, Hudson failed to discount to arrive at a present value for expected future profits from the escrow funds. Moreover, his basis for the net profit percentage of 4 percent on the escrow funds was weakly supported. We note also that at the time of the agreement there was much doubt whether the lending institutions would allow escrows to be placed in a competing banking institution where they might be utilized for a business advantage. Surely at the time the agreement was made this contingency would reduce the value of the opportunity to utilize them. Hudson did not consider this in his valuation.

Respondent's expert witness, Robert Maremick (hereinafter sometimes referred to as Maremick), went about his valuation differently, especially with respect to the residential loans. In his first step in valuing the residential loans he consulted an actuarial schedule published by the Federal Housing Administration under the title "Annual Report—Housing and Home Finance Agency—1962." This schedule showed the number of loans remaining at the beginning of each year out of an initial 100,000 residential mortgage loans having a maturity date of 23 to 25 years through 1960. The average remaining number of petitioner's residential loans for the 6th through 25th year was determined with relation to the table. For example, according to the study at the beginning of year 6 there were 81,011 loans remaining out of the initial 100,000. Year 6 was treated as the base year (i.e., 100 percent). Thus, the number of loans remaining at the beginning of year 7, namely 73,608, was 90.86 percent of year 6. Since the number of petitioner's residential loans was 17,664 at the beginning of year 6 (100 percent), the number of its loans remaining at the beginning of year 7 was 90.86 percent of that amount or 16,050. Maremick then averaged the number of loans at the beginning of year 6 (17,664), and the number at the beginning of year 7 (16,050) to obtain the average number of petitioner's residential loans remaining during the first year (16,857). The same procedure was followed in determining the average number of loans remaining during subsequent years.

In step two a total average remaining principal amount for the group during each year was ascertained in the following manner. The yearly remaining balance for $1,000 loaned for 25 years at 4.658 percent was obtained from a direct reduction loan amortization schedule. The remaining principal amount on the $1,000 loan at the beginning of the sixth year was treated as the base (100 percent) and the percent of the remaining amounts at the beginning of each subsequent year was determined with regard to that base amount. The percentage for each year was then multiplied by $8,541 (the average principal remaining

amount of a residential loan at closing) to determine the average remaining principal balance for a residential loan at the beginning of each year. The average remaining principal balance of the loan at the beginning of each year was then multiplied by the number of petitioner's residential loans remaining at the beginning of each year, as determined in step one, to obtain the total remaining group principal balance for that year. This balance in turn was averaged with the remaining group balance at the beginning of the prior year to get an average portfolio balance during the prior year. The average portfolio balance for each year was multiplied by the commission rate (4.658 percent) to obtain the service fee for that year.

Utilizing the average number of loans remaining during a year, as determined above, Maremick then computed the net profits per year based on an expense per loan of $24.63, which was the average expense for servicing loans reported by Research Committee No. 1 of the Mortgage Banker's Association of America. A present worth factor of 9½ percent was then utilized to determine present value. This 9½ percent took in risk factors which Maremick believed to be inherent in the servicing business, based on his readings in the field. The valuation obtained by respondent's witness was $865,223 for the residential loans.

In valuing the Seamen and commercial loans, Maremick utilized an 18-year and 11-year remaining life span, respectively.[10] He reduced the number of loans in each group over their life spans according to the straight-line method. The expense of servicing individual loans ($24.63) and the present worth factor (9½ percent) remained unchanged in the computation. His valuation produced a present worth of $246,198 for the commercial and $62,073 for the Seamen loans, figures which respondent argues are the proper amounts.

In general, we found that Maremick's testimony raised almost as many questions as it answered. His qualifications were not impressive, and in instances on cross-examination he showed a lack of understanding of his valuation methods. Briefly, we shall state some of the problems we have with his analysis.

First, it is not clear from the record whether the Federal Housing Administration's statistics, which were utilized in determining the residential loans remaining each year, dealt with residential loans financed by that agency or by private lending institutions. In the absence of contrary evidence, we assume that a mixture of the two was involved in the instant case. Different factors may influence the

---

[10] These remaining life spans were computed by taking the difference between the average age of the loan group and the average loan's length. For example, the difference between the commercial groups' average term (18 years) and its average age (6.956 years) is 11 years.

rate of prepayments, the number of defaults and other occurrences which affect the number of loans financed publicly, thus lessening the validity of applying these statistics to privately financed loans. In this regard, we should note that petitioner's expert witness, Thomas, seemed to indicate on cross-examination that he utilized in part the life expectancies for governmentally financed loans in forming his opinion as to the remaining life spans of the residential groups. This has been considered in our findings of fact relating to the reasonable life expectancy of the loans.

Second, Maremick used a discount factor of 9½ percent in his computations. This figure was based on research which indicated that there was a risk factor involved in purchasing a mortgage banking concern.[11] He had no actual experience upon which to base his opinion and did not adequately explain why the discount should be more than twice the prevailing interest rate in 1961, which was between 4 and 4½ percent. Maremick merely "assumed" that the risk inherent in the business would produce this high discount factor. We do not think, however, that the discount factor should be substantially higher than the prevailing interest rate in 1961.

Finally, Maremick's estimate of servicing cost per loan also seems too high. The $24.63 figure was the average cost per loan in a study of servicing businesses made by a banking association. Petitioner's $15 figure, on the other hand, was based on Clarke's actual average cost per loan and is further supported by the average cost subsequently incurred by petitioner in its servicing business. Cost based on actual figures relating to a particular business certainly seems more representative than that based on a general study of the area. We do note, however, that petitioner's cost per loan was based on an average for the servicing business as a going concern. In other words, the figures relate to a business in which the number of loans being serviced do not de-

---

[11] A. My research into this area indicated that there was a risk factor involved in the purchasing of a mortgage banking concern, or in the purchasing of a portfolio of mortgages.

I did an awful lot of research through the Mortgage Bankers Association publication. According to the Mortgage Bankers Association there are four stages that a loan or a mortgage goes through.

One is the origination stage. Normally the origination stage produces a loss because you cannot charge enough for—enough originating fees to cover the amount of originating costs.

The second stage according to this publication was when the servicing income actually exceeded the servicing expense.

And the third stage was when the servicing expense exceeded the servicing income.

The final stage was when the originating cost and the servicing expense exceeded the entire amount of income that this mortgage produced.

Therefore, I felt that there was a risk factor in purchasing this portfolio—mortgage portfolio. I then calculated or then looked at secured transactions. Where you could put your money if you wanted to place it at a secured amount of income. And bank rates at 1961 produced an income of between four and four and one half percent. Triple A securities would have produced an income of between four and one half and five percent. So I assumed that to take a risk such as this it would produce or it would be worth your while to have a factor of nine and one half percent.

crease since they are constantly replenished by future business. If the loan groups were the only loans to be serviced over the period, the cost per loan obviously would be higher.

Respondent also asserts that petitioner's cost figure did not take into account so-called indirect costs which would bring it close to the $24.63 figure. Hudson testified at least twice on cross that the $15 figure represented "all the costs attributable to the servicing operation." There is, however, some indication that Hudson may not have included all indirect costs. Nevertheless, we think the total actual costs are closer to petitioner's estimate than to the two countervailing indicators mentioned above.

Both estimates are at the extremes and, as we have pointed out, have their individual failings. We must make our own best judgment as to the portion of the $2 million properly allocable to the amortizable items. As was stated by Judge Friendly in *Commissioner* v. *Ferrer*, 304 F. 2d 125, 135 (C.A. 2, 1962), "no one expects scientific exactness * * * however roughly hewn the decision may be, the result is certain to be fairer than either extreme."

After a consideration of the entire record, we hold that $1,700,000 is allocable to the right to service existing loans and the rights to use the escrow amounts associated therewith, and the remaining $300,000 [12] to all other capital assets of indefinite duration. Of the $1,700,000, we further find and hold that $1,470,000 is allocable to the residential mortgages and escrow deposits connected therewith, $85,000 is allocable to the Seamen loans and their associated escrow deposits, and $145,000 is allocable to the commercial loans and their escrow deposits. Furthermore, since these groups of loans have definite life expectancies of 8, 10, and 5½ years, respectively, these sums are amortizable according to their respective life expectancies under section 167(a). The parties have agreed that the legal fees for the transaction will be apportioned according to the amount we have allocated to the amortizable and the nonamortizable items.

*Decision will be entered under Rule 50.*

---

[12] Respondent on brief argued that we could not use a residual valuation approach, and allocate the remainder of $2,000,000 to the nonamortizable item. He contends that this is true because the rights to service loans were terminable at will. We see no basis for this contention. If anything, this fact should be considered in determining whether or not any part of the sum is allocable to the right to service the existing loans in the first place. The argument would be that since the contracts to service existing loans could be canceled at will, Clarke had no rights to sell with respect to them; hence all value is allocable to the nonamortizable items. In *Nelson Weaver Realty Co.* v. *Commissioner*, 307 F.2d 897 (C.A. 5, 1962), reversing 35 T.C. 937 (1961), which circuit court decision was subsequently reversed in *Bisbee-Baldwin Corporation* v. *Tomlinson*, 320 F.2d 929, 930, 934 (C.A. 5, 1963), a similar argument was made by the Government in a different context. There Nelson Weaver Mortgage Co., Inc., sold its rights to service mortgages for the New York Life Insurance Co. and the Government contended that the entire amount received was a

Footnote continued on following page.

---

Footnote continued from previous page.

substitute for ordinary income. In part, the Government argued that the taxpayer had no contract right to sell because the contract was terminable at will. Rejecting this argument, the court stated (307 F.2d at 901) :

"The short answer to these contentions is that they deal only with possibilities and not with actualities. The fact is that New York Life had maintained the relationship with Mortgage Company for eight years, during which time Mortgage Company sold to New York Life about fifty-five percent of its total number of loans running into millions of dollars. * * * Mortgage Company had built up a large organization dependent in great part upon the permanence of the arrangement existing between it and New York Life. Maybe it took a risk, but risk lies at the basis of all dealings in property and business and constitutes one of the realities of business life and of taxation. Adopting the essence of a statement by Mr. Justice Holmes in *Compania General, etc.* v. *Collector,* 1927, 275 U.S. 87, 100, 48 S.Ct. 100, 72 L.Ed. 177, we said, in *Texas Trailercoach, Inc.* v. *Commissioner,* 1958, 5 Cir., 251 F.2d 395, 403 : 'The closer a tax comes to giving effect to the economic realities, the more bearable it is as the price of national security and of civilization.' And the economic reality is that New York Life did give its approval to the sale by Mortgage Company to Cobbs, Allen and Hall and that such transactions are by no means unknown to the business world."

As a practical matter here, also, the petitioner's contract rights to service existing loans were not likely to be terminated. They have a definite life expectancy and may be valued. Since the transaction has not been shown to be anything other than at arm's length, it follows that the excess not attributable to the right to service existing loans is allocable to all other items. See *Realty Loan Corp.,* 54 T.C. 1083, 1094 (1970), on appeal (C.A. 9, Nov. 27, 1970).